Filed 11/25/14

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| EDWARDS WILDMAN PALMER et al., | No. B255182 |
| Petitioners, | (Super. Ct. No. BC517799) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| SHAHROKH MIRESKANDARI, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate.  Terry A. Green, Judge.  Petition granted in part and denied in part.

McLeod, Moscarino, Witham & Flynn and John M. Moscarino for Petitioners.

No appearance for Respondent.

Parker Shumaker Mills, David B. Parker, Mark A. Graf and Jason J. Rudolph for Real Party in Interest.

_____

[*]    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part 6 of the Discussion.

INTRODUCTION

The question before us is whether the attorney-client privilege applies to intrafirm communications between attorneys concerning disputes with a current client, when that client later sues the firm for malpractice. We conclude that when an attorney representing a current client seeks legal advice from an in-house attorney concerning a dispute with the client, the attorney-client privilege may apply to their confidential communications. Adoption of the so-called "fiduciary" and "current client" exceptions to the attorney-client privilege is contrary to California law because California courts are not at liberty to create implied exceptions to the attorney-client privilege. In the unpublished portion of the opinion, we hold that the exceptions to the attorney-client privilege embodied in Evidence Code sections 958 and 962[1] do not apply to the circumstances presented here. Accordingly, we grant in part the petition of Edwards Wildman Palmer LLP and Dominique Shelton for a writ of mandate, and remand to the trial court for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

Petitioner and defendant Edwards Wildman Palmer LLP (the Firm) is an international law firm with 16 offices and over 600 attorneys. Petitioner and defendant Dominique R. Shelton is a former partner in the Firm's Los Angeles office. In March 2012 plaintiff and real party in interest Shahrokh Mireskandari retained the Firm to represent him in an invasion of privacy lawsuit against the Daily Mail, a newspaper based in the United Kingdom. Shelton was the Firm partner in charge of handling the case. On April 4, 2012, the Firm filed a complaint on Mireskandari's behalf against the Daily Mail and other defendants in the United States District Court for the Central District of California. Approximately seven weeks later, the Firm filed a First Amended Complaint.

The relationship between Mireskandari and the Firm was short lived and, for the most part, contentious. In June 2012, Mireskandari sent Shelton two emails expressing

---

[1]    All further undesignated statutory references are to the Evidence Code.

2

dissatisfaction with the Firm's billings and representation. In an email dated June 24, 2012, Mireskandari stated: "You are and have acted in complete breach of the terms of the retainer between me and your firm. [¶] Please take notice that I will hold your firm liable for any and all damages that I may incur from you[r] actions." In a 10-page email dated June 25, 2012, Mireskandari complained, among other things, that Shelton's estimate of the cost of the litigation had been vastly understated. He found it "impossible to understand how a budget can be so far off the mark and how any competent litigator can fail to see such a huge disparity in a . . . budget." He questioned why Shelton had purportedly failed to discern that the Daily Mail was likely to file an "anti-SLAPP motion,"[2] accused her of failing to timely advise him of this eventuality, and professed to be "deeply troubled by the swinging pendulum of advice that I have been given by you." Mireskandari demanded that all communications between him and Shelton be in writing, "to avoid any misunderstandings." He charged that the Firm's demand he sign an additional document "before any further work [was] undertaken" was "wholly inappropriate and unethical." Had it not been for the involvement of his own personal legal advisor, he "would have passed this matter straight to an alternat[e] attorney to deal with." Nonetheless, Mireskandari stated he continued to rely on the Firm for legal advice: "I relied and continue [to] rely [upon] you and your firm['s] expertise to provide me with reasonable, logical and informed advice about my matter."

On June 25, 2012, the Daily Mail defendants filed anti-SLAPP motions in the Daily Mail case.

---

[2]     "Code of Civil Procedure section 425.16 provides a procedure for the early dismissal of what are commonly known as SLAPP suits (strategic lawsuits against public participation)—litigation of a harassing nature, brought to challenge the exercise of protected free speech rights." (*Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 665, fn. 3.) A motion to dismiss filed under the statute's authority is commonly denominated an "anti-SLAPP motion." (*Ibid.*)

3

On August 9, 2013, Mireskandari, represented by the firm of Parker Shumaker Mills, LLP, filed the instant action for legal malpractice, breach of fiduciary duty, and breach of contract against the Firm and Shelton in Los Angeles County Superior Court.[3] The allegations in his amended complaint echoed those made in his June 2012 emails. Additionally, the amended complaint alleged that because the Firm had refused to perform additional work on the case, Mireskandari was forced to hire "on short notice" the law firm of Greenberg Glusker Fields Claman & Machtinger LLP (Greenberg Glusker) "to assist in preparing oppositions to the motions to dismiss" in the Daily Mail action.

On August 16, 2012, Greenberg Glusker substituted in as counsel for Mireskandari in the Daily Mail case. The Firm and Shelton retained outside counsel to defend them in Mireskandari's state malpractice lawsuit.

During the period June 2012 to August 16, 2012, while the Firm was still representing Mireskandari in the Daily Mail lawsuit, Shelton consulted with Edwards Wildman Palmer attorneys, Jeffrey Swope and James A. Christman, concerning Mireskandari's complaints about the Firm's representation and the billing dispute.

In November 2013, Mireskandari's attorneys in the malpractice action deposed Shelton. The notice of deposition demanded production of four categories of documents. At the deposition, Shelton invoked the attorney-client privilege and refused to answer nine questions that purportedly related to privileged communications with Swope. After the deposition, the Firm produced many of the requested documents[4] but invoked the

---

[3]     On February 14, 2014, Mireskandari filed a First Amended Complaint, which is the operative pleading.

[4]     The documents produced included "internal electronic communications" between Edwards Wildman lawyers, Shelton, and an associate assigned to the case, and "e-mail communications Ms. Shelton had with Mr. Mireskandari and various lawyers who were involved in the Daily Mail case while Edwards Wildman was representing Mr. Mireskandari." Additionally, in connection with the associate's deposition the Firm produced six boxes of hard-copy files. The documents produced included "all of the

4

attorney-client privilege in regard to "internal law firm communications between the deponent and Edwards Wildman lawyers acting in their capacity as counsel for the firm and/or documents prepared in anticipation of litigation with the plaintiff." The Firm produced a privilege log listing 387 documents it had withheld as protected by the attorney-client privilege.

Mireskandari moved to compel Shelton to answer the deposition questions and produce the documents withheld on privilege grounds. Relying primarily on *Thelen Reid & Priest LLP v. Marland* (N.D.Cal. Feb. 21, 2007) 2007 U.S. Dist. Lexis 17482 (*Thelen*), and *In re SonicBlue, Inc.* (Bankr. N.D.Cal. Jan. 18, 2008) 2008 Bankr. Lexis 181 (*SonicBlue*), Mireskandari argued that the attorney-client privilege is inapplicable when " 'a law firm is attorney to both an outside client and to itself.' " He urged that the attorney-client privilege does not attach to intrafirm communications made during, and concerning, matters related to representation of a current client.

The Firm and Shelton opposed the motion. In support they submitted the declarations of Swope and Christman. According to their declarations, Swope, a partner in the Boston office, was the Firm's general counsel; Christman, a partner in the Chicago office, was the Firm's "Claims Counsel." Swope and Christman shared responsibility "on claims handling and loss prevention issues." Shelton had sought Christman's advice in connection with the Mireskandari case in June 2012, after Mireskandari expressed dissatisfaction with the quality of the Firm's representation and billing. Swope had "numerous communications" with Shelton "in [his] capacity as General Counsel to the firm and for the purpose of advising Ms. Shelton regarding her responses to Mr. Mireskandari's complaints and the handling and management of the client relationship." Christman gave Shelton "advice in [his] official capacity as Claims Counsel for Edwards Wildman" and worked with Swope "with respect to legal issues relating to the Mireskandari representation in June of 2012."

---

drafts of various pleadings" and "communications between lawyers in the firm about the case as the case."

5

Also, Swope and Christman declared that while acting in their "capacities as counsel to the firm responsible for claims handling and loss prevention," they assigned Chicago partner Mark Durbin to the case to supervise "the preparation of pleadings that Mr. Mireskandari wanted the firm to file on his behalf, notwithstanding his existing disputes and assertions against the firm." Swope and Christman "deputized" Durbin "to advise Ms. Shelton regarding her responses to Mr. Mireskandari's complaints and on the management of the Mireskandari client relationship." They averred that Durbin's "communications with Ms. Shelton advising her regarding her responses to Mr. Mireskandari's complaints and on management of the client relationship with Mr. Mireskandari were as our deputy with claims handling and loss prevention responsibility and acting as legal counsel to the firm." The Firm did not bill Mireskandari for any of Swope's, Christman's, or Durbin's time.

In light of the foregoing, the Firm and Shelton argued that the attorney-client privilege applied to communications between Shelton and lawyers acting as counsel for the Firm. In the Firm's view, in light of Mireskandari's "[h]ostile and accusatory correspondence" in June 2012, Shelton was entitled to seek the advice of lawyers within her own firm—a common practice in the legal community—and assert the privilege as to those communications. Relying primarily on *Wells Fargo Bank v. Superior Court* (2000) 22 Cal.4th 201 (*Wells Fargo*), they argued that the federal cases cited by Mireskandari did not accurately reflect California law. They additionally pointed to cases from the supreme courts of Massachusetts and Georgia that had rejected the rationales of *SonicBlue* and *Thelen*. (*RFF Family Partnership, LP v. Burns & Levinson, LLP* (Mass. 2013) 465 Mass. 702 [991 N.E.2d 1066] (*RFF*); *St. Simons Waterfront, LLC v. Hunter, MacLean, Exley & Dunn, P.C.* (Ga. 2013) 293 Ga. 419 [746 S.E.2d 98] (*St. Simons*).)

After observing that the issue was novel, the trial court granted the motion to compel. It found *Thelen*'s reasoning—in a nutshell, that a firm's fiduciary and ethical duties to a client trump the attorney-client privilege—persuasive. The court reasoned that the client's right to be informed took precedence over any claim of privilege. Mireskandari was entitled to his file, and "if there were . . . discussions among members

6

of the firm regarding the client, the client's case, the client's claims, what was going on, that belongs to the client. The client is the holder of the privilege."

On March 27, 2014, the Firm and Shelton filed the instant petition for a writ of mandate or prohibition, asking that we compel the trial court to set aside its order and enter a new order denying Mireskandari's motion to compel. We issued an order to show cause and stayed the trial court's order.

DISCUSSION

1. *Standard of review*

We generally review a trial court's determination on a motion to compel discovery for abuse of discretion, but we independently review issues of law. (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733 (*Costco*); *Snibbe v. Superior Court* (2014) 224 Cal.App.4th 184, 189; *Kerner v. Superior Court* (2012) 206 Cal.App.4th 84, 110 (*Kerner*).) A trial court abuses its discretion when it applies the wrong legal standard or its factual findings are not supported by substantial evidence. (*Costco,* at p. 733; *Kerner,* at p. 110; *Zurich American Ins. Co. v. Superior Court* (2007) 155 Cal.App.4th 1485, 1493 (*Zurich*).)

"Extraordinary review of a discovery order will be granted when a ruling threatens immediate harm, such as loss of a privilege against disclosure, for which there is no other adequate remedy." (*Zurich, supra,* 155 Cal.App.4th at p. 1493; *Fireman's Fund Ins. Co. v. Superior Court* (2011) 196 Cal.App.4th 1263, 1272.) Here, because petitioners seek relief from a discovery order that may undermine the attorney-client privilege, review by way of extraordinary writ is proper. (*Costco, supra,* 47 Cal.4th at pp. 740-741; *Zurich,* at p. 1493.) Moreover, where "the issues presented are of first impression and of general importance to the trial courts and to the profession, writ review is appropriate." (*Save Open Space Santa Monica Mountains v. Superior Court* (2000) 84 Cal.App.4th 235, 245.)

2. *The attorney-client privilege*

California's attorney-client privilege is embodied in section 950 et seq. and protects confidential communications between a client and his or her attorney made in the

7

course of an attorney-client relationship. (*Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 371; *Kerner, supra,* 206 Cal.App.4th at p. 116.) Section 954 "confers a privilege on the client 'to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer . . . .' "[5] (*Costco, supra,* 47 Cal.4th at p. 732; *Zurich, supra,* 155 Cal.App.4th at p. 1494.) The attorney-client privilege " 'has been a hallmark of Anglo-American jurisprudence for almost 400 years.' [Citation.] Its fundamental purpose 'is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters. [Citation].' " (*Costco*, at p. 732.) "[T]he public policy fostered by the privilege seeks to insure 'the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense.' " (*Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 599; *Roberts v. City of Palmdale, supra,* 5 Cal.4th at p. 380; *Zurich,* at p. 1494.) " 'Although exercise of the privilege may occasionally result in the suppression of relevant evidence, the Legislature of this state has determined

---

[5] Section 954 provides: "Subject to Section 912 and except as otherwise provided in this article, the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer if the privilege is claimed by: [¶] (a) The holder of the privilege; [¶] (b) A person who is authorized to claim the privilege by the holder of the privilege; or [¶] (c) The person who was the lawyer at the time of the confidential communication, but such person may not claim the privilege if there is no holder of the privilege in existence or if he is otherwise instructed by a person authorized to permit disclosure. [¶] The relationship of attorney and client shall exist between a law corporation as defined in Article 10 (commencing with Section 6160) of Chapter 4 of Division 3 of the Business and Professions Code and the persons to whom it renders professional services, as well as between such persons and members of the State Bar employed by such corporation to render services to such persons. The word 'persons' as used in this subdivision includes partnerships, corporations, limited liability companies, associations and other groups and entities."

that these concerns are outweighed by the importance of preserving confidentiality in the attorney-client relationship.  As [our Supreme Court] has stated:  "The privilege is given on grounds of public policy in the belief that the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence."  [Citations.]' " (*Costco,* at p. 732.)

Section 951 defines "client," for purposes of the privilege, as "a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity . . . ." (§ 951.)  Section 950 defines "lawyer" as "a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation." (§ 950.)  "[I]t is settled that a corporate client . . . can claim the privilege." (*Costco, supra,* 47 Cal.4th at p. 733; § 954; *D. I. Chadbourne, Inc. v. Superior Court* (1964) 60 Cal.2d 723, 732, 736.)

A " 'confidential communication between client and lawyer' " is defined as "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship." (§ 952.)  "The term 'confidential communication' is broadly construed, and communications between a lawyer and his client are presumed confidential, with the burden on the party seeking disclosure to show otherwise." (*Gordon v. Superior Court* (1997) 55 Cal.App.4th 1546, 1557.)

"An attorney-client relationship exists for purposes of the privilege whenever a person consults an attorney for the purpose of obtaining the attorney's legal service or advice." (*Kerner, supra,* 206 Cal.App.4th at pp. 116-117; *People v. Gionis* (1995) 9 Cal.4th 1196, 1208.)  No formal agreement or compensation is necessary to create an attorney-client relationship for purposes of the privilege. (*Kerner,* at p. 117; *Responsible*

9

*Citizens v. Superior Court* (1993) 16 Cal.App.4th 1717, 1732 [the attorney-client relationship is " 'created by some form of contract, express or implied, formal or informal' "].)  However, no attorney-client relationship arises for purposes of the privilege if a person consults an attorney for nonlegal services or advice in the attorney's capacity as a friend, rather than in his or her professional capacity as an attorney. (*Kerner*, at p. 117.)  " 'It is settled that the attorney-client privilege is inapplicable where the attorney merely acts as a negotiator for the client, gives business advice or otherwise acts as a business agent.' " (*Zurich, supra*, 155 Cal.App.4th at p. 1504.)

As relevant here, the client is the holder of the privilege.  (§ 953, subd. (a).)  The privilege may be claimed only by the holder of the privilege, by a person authorized by the holder to claim it, or by the person who was the lawyer at the time of the confidential communication.  (§ 954; *Kerner, supra,* 206 Cal.App.4th at pp. 111-112.)  A lawyer who received or made a privileged communication is obligated to claim the privilege whenever he or she is present when the communication is sought to be disclosed.  (§ 955; *Kerner,* at pp. 111-112.)

Where the privilege applies, it may not be used to shield facts, as opposed to communications, from discovery.  (*Zurich, supra,* 155 Cal.App.4th at p. 1504; *Upjohn Co. v United States* (1981) 449 U.S. 383, 395-396 [the privilege " 'extends only to *communications* and not to facts.  A fact is one thing and a communication concerning that fact is an entirely different thing' "].)  Relevant facts may not be withheld merely because they were incorporated into a communication involving an attorney, and knowledge that is not otherwise privileged does not become so by being communicated to an attorney.  (*Costco, supra,* 47 Cal.4th at p. 735; *Zurich,* at p. 1504.)  On the other hand, the privilege bars discovery of a privileged communication irrespective of whether it includes unprivileged material; "when the communication is a confidential one between attorney and client, the entire communication, including its recitation or summary of factual material, is privileged." (*Costco,* at pp. 734, 736.)

Sections 956 through 962 enumerate eight exceptions to the attorney-client privilege.  Where none of these exceptions apply, " '[t]he privilege is absolute and

10

disclosure may not be ordered, without regard to relevance, necessity or any particular circumstances peculiar to the case.'  [Citation.]"  (*Costco, supra,* 47 Cal.4th at p. 732; *Kerner, supra,* 206 Cal.App.4th at p. 111.)

3.  *The "fiduciary" and "current client" exceptions to the attorney-client privilege are not recognized under California law.*

"As law firms have grown in both size and organization, internal ethics and claims advice has increasingly taken on institutional form."  (Fucile, *The Double Edged Sword: Internal Law Firm Privilege and the "Fiduciary Exception"* (2009) 76 Def. Couns. J. 313; Chambliss, *The Scope of In-Firm Privilege* (2005) 80 Notre Dame L.Rev. 1721 ["Large law firms increasingly are hiring their own in-house counsel to provide day-to-day ethics advice, monitor internal policies and procedures, and respond to potential and actual malpractice claims against the firm"].)  The parties do not appear to dispute that, as a general matter, an attorney can act as counsel to his or her own firm, or to another attorney who is a member of, or employed by, the firm.  "There is nothing exceptional about the proposition that individual attorneys within a law firm may seek legal advice from their colleagues about either personal matters or matters relating to the firm's interests, and that when they do so, they stand in a client relationship to the attorney whose advice has been sought."  (*TattleTale Alarm Systems, Inc. v. Calfee, Halter & Griswold, LLP* (S.D. Ohio Feb. 3, 2011) 2011 U.S. Dist. LEXIS 10412, *9;[6] *Versuslaw, Inc. v. Stoel Rives, LLP* (2005) 127 Wash. App. 309 [111 P.3d 866, 878] ["Lawyers in a law firm seeking legal advice from another lawyer in the same firm can assert the attorney-client privilege"].)  We have previously found an attorney-client relationship to exist between attorneys within the same firm.  (*Kerner, supra,* 206 Cal.App.4th at pp. 117-119.)  Applying the plain language of the relevant provisions of the Evidence Code, an attorney who consults another attorney in the same firm for the purpose of securing

---

**6**      Unpublished federal opinions are citable notwithstanding California Rules of Court, rule 8.1115, which only bars citation of unpublished California opinions. (*Haligowski v. Superior Court* (2011) 200 Cal.App.4th 983, 990, fn. 4.)

11

confidential legal advice may establish an attorney-client relationship. (See §§ 950-952.) Swope, Christman, and Durbin were obviously lawyers. (§ 950.) If Shelton, or the Firm itself, consulted Swope, Christman, or Durbin for the purpose of obtaining legal advice regarding their ethical duties or the threatened malpractice claim, they would qualify as "clients." (§ 951.) Thus, assuming a genuine attorney-client relationship existed, such confidential communications would fall within section 954's ambit.

Mireskandari, however, argues that in light of petitioners' ethical and fiduciary duties to him as his attorneys, and the purported conflict of interest arising from the Firm's representation of itself or Shelton, petitioners' intrafirm communications made during, and concerning, their representation of him are not protected by the attorney-client privilege. Relying on *Thelen* and *SonicBlue,* he urges that a lawyer who counsels another lawyer in the same firm, regarding a current client of the firm, "becomes a lawyer with an impermissible conflict of interest," and when such a conflict exists, the attorney-client privilege must be subordinated to the firm's ethical duties.

In granting Mireskandari's motion, the trial court relied primarily on *Thelen.* There, a federal district court considered "whether the attorney-client privilege applies where a law firm is attorney to both an outside client and to itself." (*Thelen, supra,* 2007 U.S. Dist. Lexis at p. *16.) The law firm of Thelen Reid & Priest represented Marland in a *qui tam* action; it simultaneously represented the California Department of Insurance (CDOI) regarding the same claims. (*Id.* at pp. *5-6.) During the representation, Thelen's general counsel advised the firm's management and attorneys regarding, inter alia, the firm's legal options in light of Marland's destruction of a key document; fee agreements between the firm and Marland; the potential conflict of interest arising from the representation of both Marland and CDOI; and whether the firm should withdraw as counsel. (*Id.* at pp. *9-12.) Thelen subsequently sued Marland to enforce a fee sharing contract. During discovery, the firm claimed the attorney-client privilege shielded various communications between Thelen's general counsel and other Thelen lawyers concerning the aforementioned topics. Marland moved to compel. The federal district court, purporting to apply California law, reasoned that the requested communications

12

"implicate[d] or affect[ed] Marland's interests, *and Thelen's fiduciary relationship with Marland as a client lifts the lid on these communications.*" (*Id.* at pp. *19-20, italics added.) The court recognized that law firms typically seek ethics advice from in-house attorneys, and that such consultations are confidential. However, "once the law firm learns that a client may have a claim against the firm or that the firm needs client consent in order to commence or continue another client representation, then the firm should disclose to the client the firm's conclusions with respect to those ethical issues." (*Id.* at pp. 20-21.) Accordingly, the court required production of, inter alia, intrafirm communications discussing Marland's potential claims against the firm, known errors in the firm's representation of him, and known conflicts in representation—including those arising from the firm's representation of itself—that triggered a duty to advise and obtain Marland's consent. (*Id.* at p. *21.)

Similarly, in *SonicBlue,* claimants in a bankruptcy proceeding sought to compel the production of documents from the law firm of Pillsbury Winthrop Shaw Pittman, former counsel for the debtors. (*SonicBlue, supra,* 2008 Bankr. Lexis 181 at p. *4.) The communications at issue reflected legal advice that Pillsbury had sought and received on its own behalf from its own attorneys, and the firm asserted the documents were protected from disclosure by the attorney-client privilege . (*Id.* at pp. *3-4, 28.) The court disagreed, reasoning that when a law firm chooses to represent itself, it runs the risk that the representation may create an impermissible conflict of interest with one or more of its current clients. (*Id.* at p. *26.) In light of these ethical concerns, "the law firm's right to claim privilege must give way to the interest in protecting current clients who may be harmed by the conflict. [Citations.] *As a result, a law firm cannot assert the attorney-client privilege against a current outside client when the communications that it seeks to protect arise out of self-representation that creates an impermissible conflicting relationship with that outside client.*" (*Id.* at pp. *26-27.)

Other authorities, primarily federal, hold similarly, relying on what have been

denominated the "fiduciary" and the "current client" exceptions.**7** (See *RFF, supra,* 991 N.E.2d at pp. 1074, 1076-1077 & fn. 7, and cases cited therein; see also, e.g., *Koen Book Distrib. v. Powell, Trachtman, Logan* (E.D.Pa. 2002) 212 F.R.D. 283, 284-285; *Bank Brussels Lambert v. Credit Lyonnais* (S.D.N.Y. 2002) 220 F.Supp.2d 283, 287; Woofter, *The "Attorney-Law Firm" Privilege: Protecting Intra-Firm Communications Regarding a Current Client's Potential Malpractice Claim* (2014) 27 Geo. J. Legal Ethics 987, 997.)

Petitioners point out that the Supreme Courts of Massachusetts, Georgia, and Oregon have rejected application of the "fiduciary" or "current client" exceptions. (*RFF, supra,* 991 N.E.2d at p. 1068; *St. Simons, supra,* 746 S.E.2d at p. 102; *Crimson Trace Corporation v. Davis Wright Tremaine LLP* (Ore. 2014) 355 Ore. 476 [326 P.3d 1181, 1183] (*Crimson Trace*).) All three were malpractice actions in which a former client sought to discover communications between in-house counsel and the lawyers who had represented the client, made while the firm represented the client.

*RFF* held that "the attorney-client privilege applies to confidential communications between a law firm's in-house counsel and the law firm's attorneys, even where the communications are intended to defend the law firm from allegations of malpractice made by a current outside client," provided certain conditions (discussed *post*) are met. (*RFF, supra,* 991 N.E.2d at pp. 1080-1081.) The court rejected the notion that any potential conflict of interest engendered by a firm's self-representation required extinguishment of the privilege. (*Id.* at pp. 1078-1079.) Moreover, policy considerations supported preservation of the privilege: an attorney's consultation with in-house counsel improves the quality of a firm's self-regulation on ethics matters, and maintaining

---

**7** Courts have used both terms to describe the exception. (See *RFF, supra,* 991 N.E.2d at pp. 1074-1077.) As relevant here, the premise underlying both is that a law firm cannot assert the attorney-client privilege against a current client when self-representation creates a conflict of interest with that client, or otherwise breaches the firm's duties to the client. For our purposes, any distinctions between the two theories are insignificant, and we use both terms interchangeably.

14

confidentiality encourages attorneys to promptly seek advice on how to rectify errors. (*Id.* at pp. 1071-1073.)

*St. Simons* came to a similar conclusion. (*St. Simons, supra,* 746 S.E.2d at p. 102.) It concluded that "the same basic analysis that is conducted to assess privilege . . . in every other variation of the attorney-client relationship should also be applied to the law firm in-house counsel situation." (*Ibid.*) Because the state rules of professional conduct did not govern applicability of the attorney-client privilege, any conflict of interest arising between the firm and the client did not affect the protections afforded to privileged communications. (*Ibid.*)

*Crimson Trace* likewise recognized that the attorney-client privilege applied to communications between attorneys in a firm and in-house counsel. (*Crimson Trace, supra,* 326 P.3d at p. 1183.) The court reasoned that unlike the judge-made law on the attorney-client privilege in other jurisdictions, Oregon's attorney-client privilege was established by statute and was a matter of legislative intent. (*Crimson Trace, supra,* 326 P.3d at pp. 1192-1193.) The Oregon code enumerated five exceptions to the privilege, but did not include a fiduciary exception. Therefore, that exception did "not exist in Oregon." (*Id.* at pp. 1192, 1195.)

Here, we need not determine which of these approaches is most persuasive, because we are not at liberty to adopt the fiduciary or current client exceptions to the attorney-client privilege. As the *Crimson Trace* court found in regard to Oregon law, in California it is well-settled that "the attorney-client privilege is a legislative creation, which courts have no power to limit by recognizing implied exceptions." (*Costco, supra,* 47 Cal.4th at p. 739; *Wells Fargo, supra,* 22 Cal.4th at p. 206; *HLC Properties, Ltd. v. Superior Court* (2005) 35 Cal.4th 54, 67; *Citizens for Ceres v. Superior Court* (2013) 217 Cal.App.4th 889, 912 ["we are forbidden to create privileges or establish exceptions to privileges through case-by-case decisionmaking"]; *Elijah W. v. Superior Court* (2013) 216 Cal.App.4th 140, 157 ["courts have no power to recognize implied exceptions to the lawyer-client privilege"]; *Roman Catholic Archbishop of Los Angeles v. Superior Court* (2005) 131 Cal.App.4th 417, 441.) "Our deference to the Legislature is particularly

15

necessary when we are called upon to interpret the attorney-client privilege, because the Legislature has determined that evidentiary privileges shall be available only as defined by statute. (Evid. Code, § 911.) Courts may not add to the statutory privileges except as required by state or federal constitutional law [citations], nor may courts imply unwritten exceptions to existing statutory privileges." (*Roberts v. City of Palmdale, supra,* 5 Cal.4th at p. 373.) "The area of privilege is 'one of the few instances where the Evidence Code precludes the courts from elaborating upon the statutory scheme.' " (*Citizens for Ceres,* at p. 913.) The California Evidence Code enumerates eight exceptions to the attorney-client privilege; the "fiduciary duty" or "current client" exceptions are not among them. Accordingly, neither exception exists under California law. (*Wells Fargo,* at p. 209.)

Indeed, our Supreme Court rejected the notion that a fiduciary exception to the attorney-client privilege exists in *Wells Fargo, supra,* 22 Cal.4th 201. There, Wells Fargo was a cotrustee of a trust. Certain beneficiaries of the trust, the Boltwoods, accused the cotrustees of misconduct. Wells Fargo petitioned the probate court to settle its accounts and approve its resignation as cotrustee. (*Id.* at p. 205.) During the ensuing litigation, the Boltwoods requested that Wells Fargo produce various documents related to the trust. Wells Fargo asserted the attorney-client privilege as to documents reflecting communications with its in-house and outside attorneys about the Boltwoods' claims of misconduct. (*Ibid.*) The Boltwoods argued that Wells Fargo was required to produce privileged communications "to fulfill its statutory and common law duties as a trustee to report to the beneficiaries about the trust and its administration," and that its duties as a trustee took precedence over the attorney-client privilege. (*Id.* at p. 206.) Our Supreme Court rejected the contention that a trustee's reporting duties trumped the privilege. (*Id.* at p. 211.) The court explained: "The privileges set out in the Evidence Code are legislative creations; *the courts of this state have no power to expand them or to recognize implied exceptions*." (*Id.* at p. 206, italics added.) "The attorney-client privilege is commonly regarded as 'fundamental to . . . the proper functioning of our judicial system' [citation] and thought to 'promote broader public interests in the

16

observance of law and administration of justice' [citation]. If the Legislature had intended to restrict a privilege of this importance, it would likely have declared that intention unmistakably, rather than leaving it to courts to find the restriction by inference and guesswork in the interstices of the Probate Code." (*Id.* at p. 207.)

*Wells Fargo* acknowledged that courts in other jurisdictions had generally given a trustee's reporting duties precedence over the attorney-client privilege. (*Wells Fargo, supra,* 22 Cal.4th at p. 208.) It pointed to *U.S. v. Mett* (9th Cir. 1999) 178 F.3d 1058, as a case typifying such decisions. *Mett* explained that the so-called "fiduciary exception" was based in two distinct rationales. One rationale was that the exception derived from a trustee's duty to disclose information to beneficiaries; "[v]iewed in this light, the fiduciary exception can be understood as an instance of the attorney-client privilege giving way in the face of a competing legal principle." (*Id.* at p. 1063.) *Wells Fargo* held such a rationale was incompatible with California law. (*Wells Fargo,* at p. 209.) The court explained that in other jurisdictions, courts "consider themselves free, in a way we do not, to create exceptions to the privilege." (*Id.* at p. 208.) "What courts in other jurisdictions give as common law privileges they may take away as exceptions. We, in contrast, do not enjoy the freedom to restrict California's statutory attorney-client privilege based on notions of policy or ad hoc justification." (*Id.* at p. 209.)

*Wells Fargo* thus forecloses Mireskandari's argument that a fiduciary or current client exception to the attorney-client privilege exists. Just as the trustee's reporting duties did not trump the attorney-client privilege in *Wells Fargo,* in the absence of a statutory exception, the Firm's ethical duties to its client do not trump assertion of the privilege here.

Mireskandari attempts to defeat this conclusion by arguing that application of the *Thelen* and *SonicBlue* rationales would not actually "carve out an exception for the attorney-client privilege" but would simply "enforce existing laws" and "prevent law firms from exploiting an impermissible conflict." He points out that Business and Professions Code section 6068, subdivision (e)(1), requires that an attorney "maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of

17

his or her client." Subdivision (m) of section 6068 imposes a duty to "respond promptly to reasonable status inquiries of clients and to keep clients reasonably informed of significant developments in matters with regard to which the attorney has agreed to provide legal services." The Rules of Professional Conduct, rule 3-500, likewise requires that a lawyer keep the client "reasonably informed about significant developments relating to the employment or representation . . . ." Furthermore, attorneys have a "fiduciary obligation to disclose material facts to their clients, an obligation that includes disclosure of acts of malpractice." (*Beal Bank, SSB v. Arter & Hadden, LLP* (2007) 42 Cal.4th 503, 514.) Rule 3-310(C) prohibits an attorney from, without the informed consent of each client, accepting representation of more than one client in a matter in which the interests of the clients potentially or actually conflict. "An attorney violates the duty of loyalty to the client by assuming a position adverse or antagonistic to the client." (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 301; see also *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.)

The answer to these arguments is threefold. First, despite Mireskandari's attempts to argue otherwise, recognition of the fiduciary or current client exceptions would clearly amount to adoption of an implied exception to the attorney-client privilege, in contravention of the well-settled principles set forth *ante.* (*Wells Fargo, supra,* 22 Cal.4th at pp. 207-209.)

Second, Mireskandari is correct that a law firm's representation of itself, or one of its partners, in regard to a dispute or a threatened claim by a current client may raise thorny ethical issues. (See, e.g., *St. Simons, supra,* 746 S.E.2d at pp. 105-106 [acknowledging that under Georgia law, when an attorney seeks advice from in-house counsel about an actual or perceived malpractice claim, a conflict is imputed to all attorneys in the firm, creating a potential ethics violation]; *City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 847 ["Normally, an attorney's conflict is imputed to the law firm as a whole"]; Chambliss, *The Scope of In-Firm Privilege*, *supra*, 80 Notre Dame L.Rev. at p. 1722 ["the role of firm counsel raises a number of ethical and regulatory issues that are unique to the law firm context"].)

18

However, it does not follow that the looming specter of ethical issues mandates the extinguishment of the attorney-client privilege. (*RFF, supra,* 991 N.E.2d at p. 1079 [counsel's failure to avoid a conflict of interest should not deprive the client of the privilege]; *Crimson Trace, supra,* 326 P.3d at p. 1195 ["rules of professional conduct may require or prohibit certain conduct, and the breach of those rules may lead to disciplinary proceedings. But that has no bearing on the interpretation or application of a rule of evidence that clearly applies"]; *Garvy v. Seyfarth Shaw LLP* (Ill. App. 2012) 359 Ill. Dec. 202 [966 N.E.2d 523, 538] [the violation of ethics rules is not relevant to the issue of privilege].) We do not intend to condone, or minimize the significance of, an attorney's violation of the Rules of Professional Conduct.[8] "Few precepts are more firmly entrenched than the fiduciary nature of the attorney-client relationship, which must be of the highest character." (*Styles v. Mumbert* (2008) 164 Cal.App.4th 1163, 1167.) If an attorney violates the Rules of Professional Conduct, he or she may be subject to discipline. (Bus. & Prof. Code, § 6077.) But nothing in the Evidence Code suggests that a potential or actual conflict of interest arising under the circumstances presented here abrogates the attorney-client privilege.

As a practical matter, it is not a foregone conclusion that an attorney's consultation with in-house counsel in regard to a client dispute will always be adverse to the client. A law firm is not necessarily disloyal to a client "by seeking legal advice to determine how best to address the potential conflict, regardless of whether the legal advice is given by in-house counsel or outside counsel." (*RFF, supra,* 991 N.E.2d at p. 1078.) The attorney's and client's interests are likely to dovetail insofar as the attorney seeks to resolve the dispute to the client's satisfaction, or determine through consultation with counsel what his or her ethical and professional responsibilities are in order to comply with them. "[A]n attorney's or a law firm's duty of loyalty to a client is not always painted in bright lines. It may not always be clear when the interests of the client and the

---

[8]    We express no opinion on whether any breach occurred here.

law firm have become so adverse that withdrawal is required in the absence of client waiver, and even when it is clear that withdrawal is necessary, a law firm may need to consider how to minimize the potential adverse consequences of withdrawal to the client . . . ." (*Id.* at p. 1073.)

Third, recognition of the attorney-client privilege under these circumstances does not undercut a firm's duty to keep a client apprised of developments in the case or alert the client to an incident of malpractice. The privilege protects confidential communications between lawyer and client, but does not excuse the firm from reporting the fact it has committed malpractice. Should an attorney's consultation with in-house counsel reveal that the attorney, or the firm, has committed malpractice, the attorney or firm would be obliged to report the malpractice to the client, although the confidential communication itself would remain privileged. "Preserving the privileged nature of [the] communications does not affect a law firm's duty to provide a client with 'full and fair disclosure of *facts* material to the client's interests.' " (*RFF, supra,* 991 N.E.2d at p. 1076.)

4. *Determination of whether an attorney-client relationship exists*

Mireskandari worries that applying the attorney-client privilege in the context presented here will allow firms to create artificial attorney-client relationships by simply labeling firm attorneys "clients," in order to negate the firm's duties and place information regarding the representation behind the cloak of privilege. Mireskandari's concerns are mitigated for at least two reasons. First, as noted *ante,* knowledge that is not otherwise privileged does not become so merely by being transmitted to an attorney. " ' "Obviously, a client may be examined on deposition or at trial as to the facts of the case, whether or not he has communicated them to his attorney. [Citation.] While the privilege fully covers communications as such, it does not extend to subject matter otherwise unprivileged merely because that subject matter has been communicated to the attorney." ' " (*Costco, supra,* 47 Cal.4th at p. 735.)

Second, the privilege will attach only when a genuine attorney-client relationship exists. *RFF* held that four prerequisites must be present in order for the attorney-client

20

privilege to apply to confidential communications between law firm attorneys and the firm's in-house counsel concerning a malpractice claim: (1) the law firm must have designated, either formally or informally, an attorney or attorneys within the firm to represent the firm as in-house or ethics counsel, so that there is an attorney-client relationship between in-house counsel and the firm when the consultation occurs; (2) where a current outside client has threatened litigation against the law firm, the in-house counsel must not have performed any work on the particular client matter or a substantially related matter; (3) the time spent on the in-house communications may not have been billed to the client; and (4) the communications must have been made in confidence and kept confidential. (*RFF, supra,* 991 N.E.2d at pp. 1068, 1080.) We believe these factors provide a helpful template for a court in determining whether a genuine attorney-client relationship existed between in-house counsel and a law firm's attorneys or the firm itself. If the in-house attorney has billed the outside client in the underlying matter for his or her time, a court might readily infer that the attorney was acting as counsel to the outside client, rather than to the firm or the firm's lawyer. If the attorney was designated as the firm's ethics counsel, general counsel, or a similar position prior to the time he or she was consulted, a court might logically infer that he or she was actually acting as the firm's or a firm lawyer's counsel. If the attorney has not performed work on the underlying matter, this inference is strengthened. Conversely, if an attorney has actually worked on the underlying matter for the outside client, a trial court might readily infer the sort of after-the-fact or inauthentic relationship about which Mireskandari expresses concern. Thus, while the *RFF* factors are not prerequisites to establishment of an attorney-client relationship under California law,[9] they are among the factors that a trial court may analyze in determining whether an actual attorney-client relationship existed.

---

[9] Of course, the fourth factor, confidentiality, is necessary for the privilege to attach. (§§ 952, 954.)

21

5. *Application here*

We turn next to application of the foregoing principles. "The party claiming the privilege has the burden of establishing the preliminary facts necessary to support its exercise, i.e., a communication made in the course of an attorney-client relationship. [Citations.] Once that party establishes facts necessary to support a prima facie claim of privilege, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish the communication was not confidential or that the privilege does not for other reasons apply." (*Costco, supra,* 47 Cal.4th at p. 733; *Citizens for Ceres v. Superior Court, supra,* 217 Cal.App.4th at pp. 898, 911.)

Whether an attorney-client relationship exists is a question of law unless the evidence is in conflict. (*Responsible Citizens v. Superior Court, supra,* 16 Cal.App.4th at p. 1733.) When the evidence conflicts, whether the attorney-client privilege applies to a particular communication is a question of fact. (*Kerner, supra,* 206 Cal.App.4th at p. 117; *HLC Properties, Ltd. v. Superior Court, supra,* 35 Cal.4th at p. 60.)

As a matter of law, petitioners failed to establish preliminary facts showing an attorney-client relationship existed between Durbin and Shelton. The Firm did not include Durbin's declaration in its opposition to the motion to compel. Shelton did not mention Durbin in the deposition excerpts attached to the motion, nor did she file a declaration in support of the motion. Durbin's normal role was not as general or ethics counsel to the firm. Instead, he was purportedly "deputized" by Swope and Christman, after the dispute arose, specifically to deal with the Mireskandari case. Even more significantly, Durbin actually worked on the Daily Mail case, supervising the preparation of pleadings. Under these circumstances, petitioners have failed to establish Shelton's communications with Durbin were confidential communications made in the course of an attorney-client relationship between them. Insofar as the trial court's ruling applied to communications between Durbin and Shelton, its ruling was correct.

Mireskandari contends that petitioners also failed to establish an attorney-client relationship between Shelton and Swope or Christman. He urges that the declarations

22

and other materials offered in opposition to his motion below showed Shelton believed Swope was her attorney, whereas Swope and Christman believed they were the Firm's attorneys. Thus, he urges, the evidence reflected only a unilateral or "hindsight" belief in representation by the Firm's attorneys. (See generally *Zenith Ins. Co. v. O'Connor* (2007) 148 Cal.App.4th 998, 1010; *Fox v. Pollack* (1986) 181 Cal.App.3d 954, 959.) Petitioners disagree, arguing that the declarations presented, as well as excerpts from Shelton's deposition attached to the motion to compel, were sufficient to establish a prima facie showing of communications made in the course of an attorney-client relationship.[10]

Mireskandari did not raise this contention below. The sole ground for his motion to compel was that the attorney-client privilege did not attach when the Firm acted as attorney to both itself and to him. Thus, the parties did not brief, and the trial court did not rule upon, the question of whether petitioners' showing was sufficient. Petitioners argue that under these circumstances, Mireskandari's arguments must be disregarded. (See *Medical Bd. of California v. Superior Court* (1991) 227 Cal.App.3d 1458, 1462; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2013) ¶ 15:23, p. 15-18 (rev. # 1, 2013).) We agree. In any event, Mireskandari's contention lacks merit. Shelton testified at her deposition that she considered Swope to be her attorney. Swope declared that he had numerous communications with Shelton in his capacity as General Counsel for the purpose of advising her regarding her responses to Mireskandari's complaints and management of the client relationship. Christman

---

**10** Petitioners also urge that because Mireskandari filed, in response to our order to show cause, an unverified opposition rather than a "true return," all allegations in the petition must be deemed admitted. (See *Bank of America, N.A. v. Superior Court* (2013) 212 Cal.App.4th 1076, 1084-1086 [the failure to submit a return by verified answer or demurrer "is not a technicality, but is an integral and critical step in the procedure for determining the merit of a petition for extraordinary relief"; in the absence of a true return, all well-pleaded and verified allegations of the petition are deemed to be true].) These principles are not dispositive here in that Mireskandari does not dispute the facts set forth in the petition.

23

declared that Shelton sought legal advice about the Mireskandari matter, and that he gave her such advice in his official capacity as Claims Counsel for the Firm. From these materials, the trial court could have concluded, as a factual matter, that petitioners met their preliminary burden to establish the existence of an attorney-client relationship. (See *Crimson Trace, supra,* 326 P.3d at p. 1189.) We leave it to the trial court to address, in the first instance, this question and any further issues that may remain in regard to Mireskandari's motion to compel.

6. *The exceptions to the attorney-client privilege in sections 958 and 962 are inapplicable.*

Mireskandari alternatively argues that the exceptions to the attorney-client privilege for communications regarding breach of duty (§ 958) and for joint clients (§ 962) apply to Shelton's communications with in-house counsel. We disagree.[11]

a. *Section 958*

Section 958 provides that there is no attorney-client privilege "as to a communication relevant to an issue of breach, by the lawyer or by the client, of a duty arising out of the lawyer-client relationship." Mireskandari argues that the communications at issue here fall within the express terms of the exception, given that he has sued petitioners for malpractice, breach of fiduciary duty, and breach of contract.

However, as petitioners point out, section 958 has been construed to apply only to communications between the client and the attorney charged with malpractice. *Schlumberger Limited v. Superior Court* (1981) 115 Cal.App.3d 386, considered whether, in an action by a client against a former attorney for malpractice, communications between the client and the attorneys representing the client in the malpractice action were protected by the attorney-client privilege. *Schlumberger*

---

[11] Petitioners argue that we need not consider these contentions because Mireskandari failed to present them below. (*Medical Bd. of California v. Superior Court, supra,* 227 Cal.App.3d at p. 1462.) To expedite resolution of the issues, however, we exercise our discretion to consider Mireskandari's arguments.

concluded that they were.  The court reasoned:  "Evidence [C]ode section 958 was not intended to abrogate the privilege as to communication between the client and the lawyer representing the client when suit is filed against a former lawyer for malpractice.  The exception is limited to communications between the client and the attorney charged with malpractice."  (*Id.* at p. 392, fn. omitted.)  There was no support for the theory that section 958 permits discovery of communications between the client and the attorney representing the client in a malpractice action against a former attorney.  (*Id.* at pp. 392-393.)  Thus, communications between a client and an attorney representing the client in a malpractice action against a former attorney are privileged.  (*Id.* at p 394.)

In *Travelers Ins. Companies v. Superior Court* (1983) 143 Cal.App.3d 436 (*Travelers*), client Becknell retained attorney Klein to bring a medical malpractice action on her behalf.  During the representation Klein notified his insurer, Travelers, of a potential claim by Becknell, as required by his policy, but continued to represent Becknell for 10 months thereafter.  (*Id.* at pp. 439-440.)  Eventually Klein substituted out of the case.  Becknell sought, in furtherance of her legal malpractice suit, to compel disclosure of documents in Travelers' claims files generated prior to the date Klein substituted out.  *Travelers* rejected the contention that section 958 applied.  The court reasoned:  "We . . . construe the exception of section 958 as being 'limited to communications between the client and the attorney charged with the malpractice,' as held by *Schlumberger Limited v. Superior Court*[, *supra*,] 115 Cal.App.3d [at p.] 392. While *Schlumberger* involved a former attorney's effort to discover communications between the former client and its new attorney" and in *Travelers* the situation was reversed, "here as well, the statute applies only to communications between the attorney (Klein) and the client (Becknell).  It does not apply, however, to communications between Klein and Travelers or between Travelers and its attorneys."  (*Travelers,* at pp. 445-446; see also *Brockway v. State Bar* (1991) 53 Cal.3d 51, 63 [section 958 only authorizes disclosure of relevant communications between a client and an attorney charged with professional wrongdoing].)

25

These authorities answer the question here. Any communication between Mireskandari and Shelton, or Mireskandari and the Firm, is not shielded by the privilege. However, assuming the requisite attorney-client relationship existed between Shelton, Swope, and Christman, confidential communications between them regarding the billing dispute and Mireskandari's dissatisfaction with the Firm's representation do not fall within section 958's ambit.

Mireskandari argues that the communications at issue relate to "an issue of breach by" petitioners, and therefore "fall within the express terms of section 958." But if the statute is read as literally and broadly as Mireskandari appears to suggest, the attorney-client privilege could never exist between an attorney charged with malpractice and his or her defense counsel. Communications between the defendant attorney and defense counsel would surely be "relevant to an issue of breach[] by the lawyer," whether between in-house or outside counsel, and whether made during or after the representation. But Mireskandari cites no authority applying section 958 in this fashion, and we are aware of none.

Mireskandari urges that section 958 should apply because all the attorneys participating in the communications were the Firm's, and therefore his, lawyers; all the Firm's lawyers owed him fiduciary duties of disclosure; and all the lawyers were his agents. (See *Streit v. Covington & Crowe* (2000) 82 Cal.App.4th 441, 445 ["by retaining a single attorney, a client establishes an attorney-client relationship with any attorney who is a partner of or is employed by the retained attorney"].) But the communications sought here are not between Mireskandari and attorneys in the firm; they are between the attorneys themselves. Accordingly, section 958 does not apply. (*Travelers, supra,* 143 Cal.App.4th at pp. 445-446.)

b. *Section 962*

Mireskandari also contends that the "joint client" exception embodied in section 962 defeats the attorney-client privilege. That section provides: "Where two or more clients have retained or consulted a lawyer upon a matter of common interest, none of them, nor the successor in interest of any of them, may claim a privilege under this article

26

as to a communication made in the course of that relationship when such communication is offered in a civil proceeding between one of such clients (or his successor in interest) and another of such clients (or his successor in interest)." (See *Rockwell Internat. Corp. v. Superior Court* (1994) 26 Cal.App.4th 1255, 1267.) "Case law has established that joint clients are two or more persons who have retained one attorney on a matter of common interest to all of them, such as where the attorney represents both an insurer and its insureds. [Citation.] 'In such a situation, the attorney has two clients whose primary, overlapping and common interest is the speedy and successful resolution of the claim and litigation.' " (*Roush v. Seagate Technology, LLC* (2007) 150 Cal.App.4th 210, 223; see also *Glacier Gen. Assurance Co. v. Superior Court* (1979) 95 Cal.App.3d 836, 842.)

Here, Shelton and Mireskandari were not joint clients for purposes of section 962. Shelton and Mireskandari did not retain the Firm "upon a matter of common interest." Mireskandari retained the Firm and Shelton to represent him in the Daily Mail case; Shelton consulted with in-house counsel not as a party to that action, but to obtain advice on how best to address Mireskandari's complaints about billing and his threats to hold the firm responsible for any damages he suffered. Mireskandari and Shelton were not co-parties; they did not employ the same attorney to oppose claims of an adversary or pursue a claim as joint plaintiffs; they were not represented by the same attorney in a business transaction. (See *Roush v. Seagate Technology, LLC, supra,* 150 Cal.App.4th at p. 225.) Mireskandari has cited no case finding persons were joint clients under circumstances analogous to those presented here, and we are aware of none. Section 962's joint client exception therefore does not apply.

DISPOSITION

The petition is granted in part and denied in part. The trial court is directed to vacate its order compelling discovery insofar as it relates to communications between Shelton and Swope or Christman. The matter is remanded to the trial court for further proceedings consistent with this opinion. Each party shall bear its own costs.

**CERTIFIED FOR PARTIAL PUBLICATION**

ALDRICH, J.

We concur:

KLEIN, P. J.

KITCHING, J.

28