Filed 4/25/22 (unmodified opinion attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SHAHROKH MIRESKANDARI, | B301785 |
| Plaintiff and Appellant, | Los Angeles County |
| v. | Super. Ct. No. BC517799 |
| EDWARDS WILDMAN PALMER LLP et al., | ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |
| Defendants and Respondents. | |

THE COURT:

It is ordered that the opinion filed on April 8, 2022, be modified as follows:

The following additional paragraph should be added to footnote 1, on page 3:

> "Mireskandari's lead appellate counsel, Becky S. James, filed the opening brief and appellant's appendix while at her former firm, James & Associates. In mid-2021, James merged her former firm with Dykema Gosset,

and Mireskandari retained Dykema Gosset to represent him in this appeal and to file the appellant's reply brief on his behalf. In his reply brief, Mireskandari opposed the motion for sanctions without authorization. (Rule 8.276(d) ["An opposition [to a motion for sanctions] may not be filed unless the court sends [written] notice" that it is considering imposing sanctions.].) He asserted the motion was "meritless," arguing (among other things) his 9,700-page appellant's appendix necessarily complied with the California Rules of Court because, if it had not, this court's "clerk would have had a duty to reject it." (See rule 8.18 ["Except as these rules provide otherwise, the reviewing court clerk must not file any record or other document that does not conform to these rules."].) The argument naturally ignored that, notwithstanding the reviewing court clerk's role under rule 8.18, sanctions are authorized for unreasonable rule violations when those violations appear in a duly filed document. (See rule 8.276, subd. (a)(4).) Ultimately, when this court notified Mireskandari we were considering imposing sanctions and authorized him to file an opposition, his appellate counsel acknowledged the rule violations in his appendix and opening brief."

There is no change in the judgment.

_____
EGERTON, J.    LAVIN, Acting P.   LIPNER, J.*
J.

_____

*  Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SHAHROKH MIRESKANDARI, | B301785 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. BC517799 |
| v. | |
| EDWARDS WILDMAN PALMER LLP et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Terry A. Green, Judge. Affirmed in part, reversed in part.

Dykema Gossett, Becky S. James and Lisa M. Burnett for Plaintiff and Appellant.

Valle Makoff, John M. Moscarino and Katherine Balatbat for Defendants and Respondents.

———————————

*   Under California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 2 through 7 of the Discussion section.

Plaintiff Shahrokh Mireskandari sued his former attorneys, defendants Edwards Wildman Palmer LLP (EWP) and Dominique Shelton, for professional negligence, breach of fiduciary duty, and breach of contract, alleging, among other things, defendants failed to advise him of our state's anti-SLAPP statute before filing a complaint on his behalf against a newspaper publisher in California federal court. He alleged the lawsuit predictably drew a successful special motion to strike, which caused him to incur substantial attorney fees litigating and losing the motion and deprived him of discovery he intended to use in a disciplinary proceeding pending against him in the United Kingdom, ultimately resulting in the loss of his law license, substantial fines and fees, and bankruptcy.

The trial court granted defendants' motion for summary adjudication of the professional negligence claim, concluding Mireskandari could not establish causation under the case-within-a-case method because he could not prove he would have prevailed in his lawsuit against the publisher but for defendants' negligence. We conclude the trial court erred. As we will explain, while we agree with the court's subsequent ruling that Mireskandari's damages claim based on the adverse outcome of the U.K. disciplinary proceeding was too speculative to create a question of fact for a jury, those damages were only *part* of his cause of action for professional negligence. Because an attorney owes a duty of care to advise a client of foreseeable risks of litigation before filing a lawsuit on the client's behalf, we conclude Mireskandari asserted a viable claim that, but for defendants' negligent failure to advise him of the risks associated with a potential anti-SLAPP motion, he would not have filed

his lawsuit in California and would not have incurred damages from litigating and losing an anti-SLAPP motion.

Mireskandari asserts several other claims of error regarding the court's pre-trial, trial, and post-trial rulings. We reject each of these challenges for the principal reason, among others, that Mireskandari has categorically failed to meet his burden to present an adequate record and argument affirmatively demonstrating prejudicial error.

Defendants moved for the assessment of sanctions against Mireskandari and his appellate counsel based on several material violations of the California Rules of Court governing the opening brief and appellant's appendix in civil appeals.[1] We gave Mireskandari and his counsel written notice that we were considering imposing sanctions for some of those violations. (Rule 8.276(c).) In response, Mireskandari's counsel acknowledged the rule violations, but explained they were unintended and resulted largely from an unanticipated combination of receiving a disordered record from trial counsel and strained office resources due to the COVID-19 pandemic. While we remain troubled by the scope of these admitted infractions, we conclude counsel's contrition and the unprecedented hardship her office and staff faced due to the pandemic make sanctions inappropriate in this case.

We reverse the order summarily adjudicating the professional negligence claim and affirm the judgment in all other respects. The motion for sanctions is denied.

---

[1] Rule references are to the California Rules of Court.

## FACTS AND PROCEDURAL HISTORY

This case and the underlying litigation that spawned it have a lengthy history. Our summary here will be brief, and we will discuss certain proceedings in more detail when we address Mireskandari's related claims of error.

1. ***The Daily Mail Articles and the U.K. Disciplinary Proceeding Against Mireskandari***

Mireskandari was educated in the United States and later moved to London, England. He was admitted to the English bar as a solicitor in 2000 and became a partner in the law firm of Dean & Dean in 2005.

Beginning in September 2008, the Daily Mail, a London tabloid, published a series of unflattering articles about Mireskandari. Among other things, the articles said Mireskandari had been convicted of fraud in California in connection with a telemarketing scam; he claimed to have a bachelor's degree from the University of Pennsylvania, of which the university had no record; he failed to pass his classes at a "minor local" law school in the United States; he obtained his law degree from the American University of Hawaii, which subsequently was shut down by the courts; and he overcharged clients for legal work.

In December 2008, the Solicitors Regulation Authority (SRA), the regulatory body for solicitors in England and Wales, took over Dean & Dean and brought a disciplinary action against Mireskandari in the Solicitor's Disciplinary Tribunal (SDT). The SRA alleged Mireskandari had misrepresented his education, training, and background to gain bar admission. It also alleged that, after obtaining his license, Mireskandari

4

misused client funds; lied about doctoring evidence; and invited serious adverse findings for his litigation misconduct.

## 2. *Mireskandari Retains Defendants to Sue the Daily Mail in the United States*

Peter Herbert was the chair of the U.K.'s Society of Black Lawyers ("SBL") and a lawyer who represented Mireskandari and directed his media strategy. The SBL had an ongoing campaign alleging the SRA disproportionately targeted minority solicitors because of their race.

In December 2011, Herbert travelled to the United States, where he met Brett Bocchieri, a Los Angeles attorney who Mireskandari testified was the "quarterback" of his U.S. legal team. Bocchieri proposed a plan for Mireskandari to file lawsuits against the SRA and the Daily Mail in California. Herbert searched for an American attorney with "privacy/media law" experience to represent Mireskandari. He was eventually referred to Shelton, who at the time was a partner in EWP's Los Angeles office.

On March 6, 2012, Herbert and Mireskandari's future wife, Saeedeh Mirshahi, met with Shelton to discuss a potential privacy claim. The essence of the claim was that a Los Angeles-based Daily Mail reporter, David Gardner, misrepresented he had Mireskandari's consent to search a National Student Clearinghouse (NSC) website to access Mireskandari's confidential education records.

On April 4, 2012, EWP filed Mireskandari's invasion of privacy case in the United States District Court for the Central District of California, alleging Gardner had hacked into Mireskandari's confidential educational records on the NSC website.

**3.**    ***The First Amended Complaint; the Daily Mail's Special Motion to Strike; and the SDT's Decision Striking Mireskandari from the Roll of Solicitors***

On April 16, 2012, the NSC informed Mireskandari it did not have his law school records. Because this disclosure confirmed there had not been an "unlawful hacking," Shelton advised Mireskandari that he would need either to dismiss the case or to file an amended complaint. She also advised Mireskandari that continuing the litigation would pit his privacy rights against the Daily Mail's First Amendment rights and would likely draw a motion to strike under California's anti-SLAPP statute. Mireskandari instructed Shelton to file the amended complaint.

On May 23, 2012, defendants filed Mireskandari's first amended complaint, alleging, among other things, the Daily Mail published false and misleading articles about him.

In June 2012, Associated Newspapers Limited, the Daily Mail's publisher, filed a special motion to strike all Mireskandari's state law claims under the anti-SLAPP statute.

The same month, the SDT issued its decision in Mireskandari's disciplinary proceeding. Among other things, the tribunal found Mireskandari misrepresented his post-graduate education; he had been convicted of telemarketing fraud in California; and his conduct "had caused financial damage to former clients." The SDT concluded Mireskandari's conduct "had shown a complete and blatant disregard for his professional obligations" and, if Mireskandari were allowed to continue to practice law, he would pose "a very significant risk to the public." Finding "no means by which he could rehabilitate himself," the tribunal ordered Mireskandari struck from the Roll of Solicitors.

4. ***The Attorney-Client Relationship Deteriorates and Mireskandari Retains Successor Counsel***

Following a discussion about his case and EWP's bills, Mireskandari sent Shelton an email entitled "Notice," accusing her of acting "in complete breach of the terms of the retainer between me and your firm." He said he was "deeply troubled" by a "swinging pendulum of advice" and demanded written communications "to avoid any misunderstandings." Shelton consulted with EWP's general counsel, Jeffrey Swope, about Mireskandari's complaints and the client relationship. Notwithstanding the billing dispute, EWP added personnel to Mireskandari's litigation team to oppose the anti-SLAPP motion.

In July 2012, Mireskandari retained Bonnie Eskenazi and her firm Greenberg Glusker to work on the Daily Mail case. The firm later substituted into the case to replace EWP. In October 2012, Eskenazi sent Mireskandari an email identifying "a damages/causation problem and a res judicata/collateral estoppel problem" due to the SDT judgment. In January 2013, Eskenazi sent Mireskandari a 43-page memorandum discussing the preclusive effect of the SDT judgment and emphasizing the need to formulate "a viable exit strategy."

In April 2013, Bocchieri replaced Greenberg Glusker as Mireskandari's counsel in the Daily Mail case. The attorney-client relationship soured over Mireskandari disregarding Bocchieri's advice, and Mireskandari substituted another attorney into the case.

In October 2013, the federal district court granted the publisher's special motion to strike several of Mireskandari's claims, with leave to amend.

In November 2013, Mireskandari filed a second amended complaint.  The Daily Mail's publisher filed a second anti-SLAPP motion.  After lodging a third amended complaint, Mireskandari dismissed his federal action.

In March 2014, Mireskandari filed a new action against the Daily Mail's publisher in California state court.  The publisher filed another anti-SLAPP motion.  The trial court granted the motion in part but denied it with respect to the false light claim.  This court reversed the order in part and directed the trial court to grant the anti-SLAPP motion in its entirety, concluding the SDT judgment barred Mireskandari's false light claim under the substantial truth doctrine.[2]

**5.     *Mireskandari Sues Defendants for Legal Malpractice; Pretrial Rulings Limit Mireskandari's Damages Claims***

In August 2013, Mireskandari filed this lawsuit against defendants.  His operative second amended complaint asserted causes of action for professional negligence, breach of fiduciary duty, and breach of contract.  It alleged defendants negligently failed to advise Mireskandari of California's anti-SLAPP statute; breached their fiduciary duties by, among other things, misrepresenting Shelton's qualifications, generating unreasonable fees, and failing to advise Mireskandari about California's anti-SLAPP statute; and breached provisions of

---

[2]     Defendants' request for judicial notice of records from Mireskandari's earlier appeal (Case No. B262942) and writ petition (Case No. B264169) is granted.  We also take judicial notice of the federal district court's order denying Mireskandari's application for discovery in Case No. CV 12-10310.

the parties' engagement agreement pertaining to the retainer payment, monthly invoices, and fee disputes.

Defendants moved for summary adjudication of the professional negligence claim, arguing Mireskandari could not establish causation under the case-within-a-case method because he did not predicate his claim on the outcome of the Daily Mail case and he admitted a more favorable outcome in the SDT disciplinary proceeding was speculative. The trial court granted the motion.

Citing discovery responses in which Mireskandari claimed over $220 million in damages associated with the judgment against him in the SDT proceeding, defendants advised the trial court of their intention to move for an order precluding Mireskandari from introducing evidence or making any argument for recovery of those damages. The parties stipulated to briefing and a hearing under Evidence Code section 402 to adjudicate this "important threshold issue." After a nine-day evidentiary hearing, the court entered an order precluding Mireskandari from presenting the damages theory to the jury, concluding the evidence was too speculative to prove the causation or damages elements of the claim.

Defendants filed a motion in limine arguing Mireskandari could not claim the attorney fees incurred in the Daily Mail case as damages because he did not assert he could have achieved a more favorable result in that action. The trial court denied the motion in part, concluding the case-within-a-case method did not preclude Mireskandari from seeking recovery of those attorney fees on his breach of fiduciary duty claim. However, the court found it was not "reasonably foreseeable" that Mireskandari's successor counsel would file a second amended

9

complaint, then dismiss the federal action in favor of a state court action.  Thus, the court ruled Mireskandari could introduce evidence of only those attorney fees incurred through the date of the district court's anti-SLAPP ruling in the Daily Mail case.

**6.** ***The Jury Finds Shelton Did Not Breach Her Fiduciary Duty and Mireskandari Could Have Avoided Damages Attributable to EWP's Breach***

In May 2019, Mireskandari's claims for breach of fiduciary duty and breach of contract proceeded to a jury trial. He presented five theories of liability for breach of fiduciary duty, asserting defendants "knowingly acted" against his interests in connection with:  (1) descriptions of Shelton's qualifications; (2) advice about the anti-SLAPP statute; (3) failing to disclose malpractice; (4) abandonment; and (5) assembling a team of lawyers to act against him.  The jury found Shelton was not liable on any theory.  With respect to EWP, the jury found the firm was not liable for breach of the parties' engagement agreement, but EWP had breached its fiduciary duty by assembling a team of lawyers to act against Mireskandari.  However, the jury awarded Mireskandari no damages, finding he could have "reasonably avoided harm" with respect to all the attorney fees he claimed as damages.

Mireskandari moved for a new trial and for judgment notwithstanding the verdict.  The trial court denied the motions. This appeal followed.

10

## DISCUSSION

1. ***Defendants Failed to Satisfy Their Initial Burden for Summary Adjudication of the Professional Negligence Claim***

The rules governing summary adjudication are well established. "A defendant making [a] motion for summary adjudication has the initial burden of showing that the [challenged] cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action." (*Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 81–82; Code Civ. Proc., § 437c, subd. (f)(1).) "If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied." (*Intrieri,* at p. 82; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849; Code Civ. Proc., § 437c, subd. (p)(2).) The court is authorized to grant summary adjudication only if the motion "completely disposes of a cause of action." (Code Civ. Proc., § 437c, subd. (f)(1).)

In reviewing an order granting summary adjudication, "we apply the same standard of review applicable on appeal from a grant of summary judgment. [Citation.] Accordingly, ' ". . . we take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' [Citation.] We liberally construe the evidence in support of the party opposing summary [adjudication] and resolve doubts concerning the evidence in favor of that party." ' " (*Schofield v. Superior Court* (2010)

190 Cal.App.4th 154, 156–157, quoting *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 716–717.)

We begin with the complaint's allegations, as the pleadings "determine the scope of relevant issues" for summary adjudication. (*Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60, 74; *Hilton K. v. Greenbaum* (2006) 144 Cal.App.4th 1406, 1412.) Mireskandari's operative second amended complaint alleges defendants breached the standard of care by, among other things, failing to advise Mireskandari, before filing a lawsuit on his behalf, that "filing the Daily Mail case in a jurisdiction that applied California's anti-SLAPP statutes or similar statutes could result in the defendants in that case filing a motion to dismiss the complaint pursuant to those statutes; that if such a motion were granted, Plaintiff would lose his case at the pleading stage and Plaintiff would be liable for those defendants' attorneys' fees; and that, regardless of whether the trial court granted or denied such a motion, an appeal could result that would substantially increase the cost and delay the prosecution of the Daily Mail case." The complaint alleges defendants also failed to advise Mireskandari, "prior to the filing of the Daily Mail case," that he could have filed the action "in a jurisdiction that did not apply California's anti-SLAPP statute or any similar statute and that, by doing so, Plaintiff could avoid having his case dismissed at the pleading stage, exposure to liability for the defendants' attorneys' fees and the increased costs and delay resulting from a successful motion to dismiss based on California's anti-SLAPP statutes or similar statutes." With respect to causation, the complaint alleges that, as "a direct, proximate and legal result of Defendants' breach of the duty of care owed to Plaintiff, Plaintiff has suffered damages

12

in that Plaintiff was required to engage the services of Greenberg Glusker to oppose the anti-SLAPP motions in the Daily Mail case and thereby incurred costs and attorneys' fees in the amount of approximately $262,000, plus additional amounts to be proven at trial, that Plaintiff would not have incurred but for Defendants' breach of their duty of care."

Defendants expressly limited their summary adjudication motion to challenging the causation element of Mireskandari's professional negligence claim. They relied principally upon our Supreme Court's statement in *Viner v. Sweet* (2003) 30 Cal.4th 1232 (*Viner*) that, "[i]n a litigation malpractice action, the plaintiff must establish that *but for* the alleged negligence of the defendant attorney, the plaintiff would have obtained a more favorable judgment or settlement *in the action in which the malpractice allegedly occurred*." (*Id.* at p. 1241, second italics added.) Based on this passage, defendants argued Mireskandari could not prevail on his cause of action for professional negligence, because he did "not predicate his claim on the outcome of the suit in which defendants . . . represented him" —i.e., the Daily Mail case filed in federal court. To the extent Mireskandari advanced the "alternative theory" that he would have achieved a more favorable result in the SDT disciplinary proceeding, defendants argued his claim was contrary to the test for causation under *Viner* and his discovery responses proved he lacked sufficient evidence to establish proximate causation.

Mireskandari opposed the motion, characterizing it as a "disguised motion in limine on damages." While he acknowledged that "part" of his claimed damages flowed from the adverse result of the SDT disciplinary proceeding, he emphasized that his complaint also sought "attorneys' fees

13

and costs resulting from Defendants' negligence in filing the Daily Mail action in California and subjecting Plaintiff to the Daily Mail's Anti-SLAPP motion." He maintained defendants' summary adjudication motion "ignore[d] the substantial attorneys' fees" incurred in litigating the anti-SLAPP motion, and he asserted there was "no question" that, by "filing the initial complaint in California and subjecting Plaintiff to California's Anti-SLAPP statute, . . . [defendants] caused Plaintiff's case against the Daily Mail to be mired in California for its entire duration and subjected Plaintiff to hundreds of thousands of dollars in legal fees and sanctions." That claim, Mireskandari argued, was viable under *Sindell v. Gibson, Dunn & Crutcher* (1997) 54 Cal.App.4th 1457 (*Sindell*), where this court held attorney fees incurred in "*unwanted*" litigation stemming from an attorney's negligence constituted "recoverable damages," regardless of the litigation's ultimate outcome. (*Id.* at p. 1470.)

The trial court granted defendants' summary adjudication motion, albeit with earnest reservations. The court acknowledged, as Mireskandari had argued, that defendants' motion did not address all the allegations underpinning the professional negligence claim. Specifically, the court observed, the motion did not directly challenge the theory that "if Mireskandari had been told all these facts about anti-SLAPP, he would have taken a one-way ticket out of California . . . and never considered filing . . . here" and "because he wasn't told about this anti-SLAPP, he is now stuck with . . . [n]ot only his own draconian attorneys' fees, but the other side's draconian [attorneys'] fees too." However, while the trial court expressed its personal view that Mireskandari's professional negligence claim "has merit," it agreed with defendants that *Viner*

14

demanded proof of a more favorable judgment in the underlying action.  In view of *Viner*, the trial court concluded defendants were entitled to summary adjudication.

Mireskandari contends defendants' argument and the trial court's ruling elevated dicta in *Viner* over the case's core holding. He maintains the actual holding of *Viner* is a simple recognition that the "but for" causation standard applies in transactional malpractice cases, just as it applies in litigation malpractice cases.  Mireskandari argues satisfying this causation standard does not require proof that the client would have won the underlying litigation, because the avoidance of "needlessly incurred" litigation expenses may itself constitute a more favorable outcome.  We agree with Mireskandari.

*Viner* is not a litigation malpractice case.  Our Supreme Court granted review in *Viner* to decide "whether the plaintiff *in a transactional legal malpractice action* must prove that a more favorable result would have been obtained *but for* the alleged negligence." (*Viner, supra,* 30 Cal.4th at pp. 1238–1239, first italics added.)  The bulk of the *Viner* opinion discusses our high court's reasons for rejecting the appellate court's attempt to "distinguish litigation malpractice from transactional malpractice in order to justify a relaxation of the 'but for' test of causation in transactional malpractice cases." (*Id.* at p. 1241; see *id.* at pp. 1241–1243.)  In connection with this discussion, the *Viner* court referred to the familiar case-within-a-case method for establishing causation in litigation malpractice cases, observing, as defendants emphasized in their summary adjudication motion, that "[i]n a litigation malpractice action, the plaintiff must establish that *but for* the alleged negligence of the defendant attorney, the plaintiff would have obtained a more favorable

15

judgment or settlement in the action in which the malpractice allegedly occurred." (*Id.* at p. 1241.) But our high court expressly cautioned that the "requirement that the plaintiff prove causation should not be confused with the method or means of doing so," clarifying, "[p]hrases such as 'trial within a trial' [and] 'case within a case' . . . describe methods of proving causation, *not* the causation requirement itself or the test for determining whether causation has been established." (*Id.* at p. 1240, fn. 4, italics added.) In view of this admonition, it is apparent that the *Viner* court intended only to illustrate one way by which a plaintiff establishes but for causation in a litigation malpractice case; it did not intend to prescribe a blanket method for determining whether causation has been established in every litigation malpractice action.

In any event, given that the *Viner* court granted review to determine the standard for causation that applies in *transactional malpractice* cases (see *Viner, supra,* 30 Cal.4th at pp. 1238–1239), the court's actual holding is unmistakable. As our high court explained, "In both litigation and transactional malpractice cases, the crucial causation inquiry is *what would have happened* if the defendant attorney had not been negligent." (*Id.* at p. 1242.) Because none of the purported distinctions between litigation and transactional malpractice cases had any bearing on this inquiry, the *Viner* court held, "just as in litigation malpractice actions, a plaintiff in a transactional malpractice action must show that *but for* the alleged malpractice, it is more likely than not that the plaintiff would have obtained *a more favorable result*." (*Id.* at p. 1244, second italics added.) Mireskandari's professional negligence claim, premised on the allegations that he would have avoided significant litigation

expenses and attorney fee sanctions, but for defendants' negligent failure to advise him about the anti-SLAPP statute, satisfies that standard.

As defendants acknowledge, an attorney's duty to exercise the skill and care that a reasonably careful attorney would use in similar circumstances extends to prelitigation investigation and evaluation of a client's potential claims. " 'When one suspects that another has caused harm, a preliminary investigation is usually necessary in order to know whether one has a potential legal claim, evaluate the likelihood of success, and *decide whether or not to assert it*. Consequently, the investigation of a potential claim is normally and reasonably part of effective litigation, if not an essential part of it.' " (*Takhar v. People ex rel. Feather River Air Quality Management Dist.* (2018) 27 Cal.App.5th 15, 28–29, italics added.) With the duty to investigate comes an attorney's duty to evaluate and advise clients of the risks of contemplated litigation.

*Charnay v. Cobert* (2006) 145 Cal.App.4th 170 (*Charnay*) is instructive. Charnay retained the defendant attorney to defend her in a limited civil suit by her neighbor to recover $18,903.64 in repair costs after land subsistence damaged a slope on subdivided property they shared with other neighbors. (*Id.* at pp. 174–175.) According to Charnay, the attorney initially advised her to settle the neighbor's action, but then, "recognizing an opportunity to generate significant attorney fees, changed his recommendation and suggested [Charnay] vigorously defend the lawsuit and pursue a cross-complaint for declaratory relief, reformation, breach of fiduciary duty and indemnity against the [suing neighbor] and other neighbors in the 60-acre tract." (*Id.* at p. 175.) After lengthy discovery, unsuccessful summary

17

judgment motions, and a 15-day bench trial, the court in the underlying action entered a judgment against Charnay on the neighbor's complaint, her cross-complaint, and a responsive cross-complaint by the other neighbors, ordering her to pay the original $18,903.64 in repair costs, "the aggregate sum of $580,000 for the opposing parties' attorney fees pursuant to [a] fee-shifting provision in the [subdivision's] CC&R's," and other damages. (*Id.* at p. 176.) Charnay sued her attorney for professional negligence, alleging the attorney failed to advise her that his recommended course could subject her to liability for attorney fees far in excess of the $18,903.64 at issue in the neighbor's lawsuit. She alleged, "but for [the attorney's] negligence, misrepresentations and omissions, she would have been able to settle the [original] lawsuit for no more than $25,000." (*Ibid.*) The trial court sustained the attorney's demurrer, concluding Charnay could not establish proximate causation. (*Id.* at pp. 178–179.) The appellate court reversed.

Addressing causation, the reviewing court rejected the trial court's conclusion that Charnay had to allege the neighbor would have accepted her proposed settlement. (*Charnay, supra,* 145 Cal.App.4th at p. 180.) Whether Charnay could have settled the matter for the $25,000 figure was "immaterial" to the causation issue because, under *Viner*, she needed "only allege that, but for [the attorney's] malpractice, she would have obtained a 'more favorable result' than the $600,000-plus judgment ultimately rendered against her." (*Charnay,* at pp. 180–181, quoting *Viner, supra,* 30 Cal.4th at p. 1244.) Charnay met this standard, having alleged that, if she had been "advised of the consequences of not prevailing, including the risk of being held liable for the opposing parties' attorney fees were she to lose at trial, she would not have

18

acceded to [the attorney's] advice to go forward with the litigation and would not have continued with the litigation in the face of escalating litigation costs on both sides." (*Charnay,* at p. 176.)

*E-Pass Technologies, Inc. v. Moses & Singer, LLP* (2010) 189 Cal.App.4th 1140 (*E-Pass*) is also instructive. E-Pass sued the attorneys who represented it in bringing four patent enforcement actions, after a federal circuit court affirmed a judgment requiring E-Pass to pay $2.3 million in attorney fees to the opposing parties as sanctions for bringing frivolous claims. (*Id.* at pp. 1143–1146.) The trial court in the state malpractice action sustained the attorneys' demurrer on the ground that the court lacked subject matter jurisdiction over the action because E-Pass's claims involved substantial issues of federal patent law. (*Id.* at p. 1146.) The appellate court reversed.

The reviewing court reasoned the malpractice action did not implicate questions of federal law because E-Pass's right to relief did not depend on the potential for success in the patent litigation. (*E-Pass, supra,* 189 Cal.App.4th at pp. 1149–1150.) E-Pass had alleged the attorneys " 'failed to conduct a pre-filing investigation' " that would have revealed " 'there was no legitimate evidence to support any claims asserted on behalf of E-Pass,' " and the complaint sought "to recover damages 'caused by defendants' misconduct [in] misleading E-Pass into bringing claims which were never viable, . . . gouging E-Pass with unreasonable attorney fees and costs[,] and . . . subjecting E-Pass to liability for costs and fees of the prevailing parties in the underlying actions.' " (*Id.* at p. 1147.) The reviewing court explained, "E-Pass's complaint does not rest on the assertion that defendant's negligence caused it to lose or fail to enforce patent rights that it was entitled to enforce. The complaint proceeds

19

on the contrary premise that there was no infringement, as the federal court held in the underlying litigation, and that E-Pass was damaged *by pursuing litigation that defendants, in the exercise of reasonable care, should have advised it not to pursue.*" (*Id.* at p. 1150, italics added.)

Critically, the *E-Pass* court rejected the contention that establishing causation and damages required proof of success in the underlying patent litigation. As with the element of breach, the court held "to prove damages E-Pass need not establish the recovery to which it would have been entitled if it had proved that its patent had been infringed. It need only show the attorney fees and other liabilities it incurred as the result of pursuing the litigation" the defendants negligently recommended. (*E-Pass, supra,* 189 Cal.App.4th at p. 1151; accord *Sindell, supra,* 54 Cal.App.4th at p. 1470 [recognizing "well-established principle that attorney fees incurred through instituting or defending an action as a direct result of the tort of another are recoverable damages," and holding this principle applies to the tort of legal malpractice, regardless of the outcome of underlying litigation].)

As *Charnay* and *E-Pass* illustrate, when an attorney breaches the duty of care by failing to advise the client of reasonably foreseeable risks of litigation before a complaint is filed, the client need not prove the subsequently-filed litigation would have been successful to establish the causation element of his professional negligence claim. Rather, the client can demonstrate he "would have obtained a more favorable result" (*Viner, supra,* 30 Cal.4th at p. 1244), by proving that, but for the attorney's negligence, he would not have pursued the litigation and thus would not have incurred the damages attributable to the foreseeable risks that the attorney negligently failed to

20

disclose. (See *Charnay, supra,* 145 Cal.App.4th at pp. 180–181; *E-Pass, supra,* 189 Cal.App.4th at pp. 1150–1151.) In other words, to answer the "crucial causation inquiry" articulated in *Viner*—"what would have happened if the defendant attorney had not been negligent" (*Viner,* at p. 1242, italics omitted)— the client may respond with evidence showing he would not have filed the litigation in the first place and he would have been better off as a result.

Not only is this conclusion consistent with the *Viner* court's articulation of the general rule of causation in legal malpractice cases, but it is also compelled by logic and sound policy. "An attorney's duty, the breach of which amounts to negligence, is not limited to his failure to use the *skill* required of lawyers. Rather, it is a wider obligation to exercise due care to protect a client's best interests in all ethical ways and in all circumstances." (*Day v. Rosenthal* (1985) 170 Cal.App.3d 1125, 1147.) As Mireskandari reasonably submits, if attorneys were immune from malpractice liability for failing to advise a client *not to file a lawsuit*, it would allow attorneys to "collect handsome fees for pursuing litigation, without regard to whether the litigation is likely to be successful, whether another remedy is available that may be more beneficial to the client, and whether the contemplated litigation exposes the uninformed client to unacceptable risks such as fee-shifting provisions." Embracing defendants' narrow reading of what appears to be dicta in *Viner* would effectively endorse this absurd result—an attorney could negligently convince a client to pursue costly litigation with no hope of success, then claim

21

his malpractice was not the legal cause of the client's injury because the litigation in fact had no hope of success.[3]

That is essentially what happened here on summary adjudication. Mireskandari alleged that, but for defendants' failure to advise him about the anti-SLAPP statute, he would not have filed the Daily Mail case in California, and he would not have incurred substantial legal fees to litigate an anti-SLAPP motion, nor would he have been subject to a sanction for

_____

[3] We are mindful that the dicta of the Supreme Court, "while not controlling authority, carries persuasive weight and should be followed where it demonstrates a thorough analysis of the issue or reflects compelling logic." (*Smith v. County of Los Angeles* (1989) 214 Cal.App.3d 266, 297; *Candelore v. Tinder, Inc.* (2018) 19 Cal.App.5th 1138, 1149.) However, as we have explained, it is apparent from the context of the *Viner* court's reference to the case-within-a-case method that our high court did not intend to prescribe a blanket method for determining whether causation had been established in every litigation malpractice action, but meant only to illustrate one way by which the element could be established. (See *Viner, supra,* 30 Cal.4th at p. 1240, fn. 4 [the "requirement that the plaintiff prove causation should not be confused with the method or means of doing so"; "[p]hrases such as 'trial within a trial' [and] 'case within a case' . . . describe methods of proving causation, not the causation requirement itself or the test for determining whether causation has been established"].) Moreover, because applying defendants' narrow reading of this passage to pre-filing professional negligence claims would produce the absurd results outlined above, we must decline to follow that narrow reading on this point. (See *Candelore*, at p. 1149 [declining to follow Supreme Court dicta where it conflicted with direct Supreme Court precedent on particular point and thus could not have been intended to cover controversy at issue].)

the opposing side's attorney fees when he lost. In moving for summary adjudication, defendants did not challenge the allegation that they breached the standard of care. Instead, they argued they could not be held liable for this alleged malpractice because the risk they negligently failed to disclose predictably came to fruition—the Daily Mail brought a successful anti-SLAPP motion and Mireskandari, saddled with his own substantial attorney fees and the Daily Mail's, dismissed the federal case. It was a classic catch-22 argument, premised, as we have explained, on an unreasonably narrow reading of an isolated passage in *Viner*. We must reject it. (See *Boeken v. Philip Morris USA Inc.* (2013) 217 Cal.App.4th 992, 1000 [Courts must reject interpretations of case law that "make[ ] little sense": " 'There is enough unavoidable absurdity in life. We should avoid absurdity in the law.' "].)

In defense of the summary adjudication ruling, defendants argue they satisfied their moving burden by "countering the specific 'hypothetical alternative' Mireskandari elected"—namely, his claim that if he had filed the Daily Mail action in Virginia, he would have obtained evidence to change the result of the SDT proceeding. As we explain below, we find no error in the trial court's subsequent ruling that Mireskandari's claim for damages related to the SDT judgment was too speculative to be presented to a jury. However, as Mireskandari emphasized in his summary adjudication opposition, only "part" of his claimed damages flowed from the adverse result of the SDT disciplinary proceeding, and defendants' motion failed to address the attorney fees and sanctions he incurred in connection with the Daily Mail's anti-SLAPP motion. Because summary adjudication must completely dispose of the challenged cause of action (Code Civ.

Proc., § 437c, subd. (f)(1)), defendants could not meet their initial burden by showing only one aspect of the professional negligence claim lacked merit. (See *McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 975 ["If a cause of action is not shown to be barred in its entirety, no order for summary judgment—or adjudication—can be entered."].)

Finally, defendants argue Mireskandari cannot establish causation because the jury in the trial of his breach of fiduciary duty claim found he "could have reasonably avoided his claimed damages, including the fees allegedly incurred to oppose the anti-SLAPP motion and the attorneys' fee award." There are two problems with this argument. First, our review of an order granting summary adjudication is limited to "the facts [in] the record [that was] before the trial court *when it ruled on that motion*," and we are prohibited from considering evidence or findings from the subsequent trial of Mireskandari's other causes of action. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1034–1035, italics added; *Jackson v. AEG Live, LLC* (2015) 233 Cal.App.4th 1156, 1165, fn. 5.) Second, as Mireskandari correctly argues, given the jury's finding that defendants did not intentionally breach their fiduciary duty by knowingly concealing the risk of an anti-SLAPP motion, we cannot presume the jury would have awarded no damages if it had been presented with the alternative claim that defendants were merely negligent in failing to advise Mireskandari of this risk.[4] (See *Knutson v. Foster* (2018) 25 Cal.App.5th 1075, 1091

---

[4] We note the verdict form directed the jury to answer the mitigation question only if it found one of the defendants liable for breach of fiduciary duty on one or more of the theories Mireskandari asserted. Because the jury found only EWP liable

24

(*Knutson*) ["Because legal malpractice involves negligent conduct on the part of an attorney [citation], causation for legal malpractice is analyzed differently than causation for the intentional torts of fraudulent concealment and intentional breach of fiduciary duty."].)

Mireskandari asserted a viable claim for professional negligence based on defendants' alleged failure to advise him of California's anti-SLAPP statute before he filed his lawsuit in California. Defendants indirectly challenged the claim on a ground that does not support a judgment in their favor. They failed to meet their initial burden. The trial court erred in granting summary adjudication.

2. ***The Trial Court Properly Barred Mireskandari's Speculative Claim for Damages Related to the SDT Disciplinary Proceeding***

Mireskandari contends the trial court erroneously precluded him from introducing evidence to the jury regarding alleged damages resulting from the SDT proceeding. He says

---

on the theory that it "assembl[ed] . . . a team of lawyers to act against him," the jury's mitigation finding was necessarily limited to that theory and it can have no preclusive effect on Mireskandari's claim that defendants were professionally negligent in failing to advise him about the anti-SLAPP statute. (*Plumley v. Mockett* (2008) 164 Cal.App.4th 1031, 1048–1049 [collateral estoppel applies only when "issue [in controversy] is identical to an issue decided in a prior proceeding"; findings had no collateral estoppel effect where issue in tort action was whether salesperson misappropriated manufacturer's invention, while issue in salesperson's subsequent malicious prosecution action was whether manufacturer had reasonable cause to believe salesperson misappropriated invention].)

25

his "first and foremost goal" in retaining defendants to bring a lawsuit against the Daily Mail "was to obtain evidence through discovery of malfeasance by the SRA."  "[T]hat evidence," Mireskandari posits, "would then show the SRA investigation was a predetermined sham based on improper motives, and his legal career could be saved."  He confirms this "damages theory was a crucial underpinning of his cause of action for legal malpractice and breach of fiduciary duty."

After a nine-day hearing under Evidence Code section 402, the trial court entered an order barring Mireskandari from presenting the theory to the jury, concluding his proffered evidence of causation was "too speculative" to support a verdict in his favor.  We agree with the trial court's assessment of this threshold legal issue.  (See, e.g., *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 753 ["the trial court has the duty to act as a 'gatekeeper' to exclude speculative expert testimony"].)

"The elements of a cause of action for breach of fiduciary duty are:  (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach."  (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1086.)  A claim for attorney professional negligence likewise requires proof of "a proximate causal connection between the breach and the resulting injury."  (*Martorana v. Marlin & Saltzman* (2009) 175 Cal.App.4th 685, 693.)  "The purpose of the causation requirement is to safeguard against speculative and conjectural claims and to ensure that damages awarded for the attorney's malpractice actually have been caused by the malpractice."  (*Knutson, supra,* 25 Cal.App.5th at p. 1091.)  "A plaintiff cannot recover damages based upon speculation

26

or even a mere possibility that the wrongful conduct of the defendant caused the harm." (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 133 (*Williams*).)

Proximate cause has "two aspects." (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 352 (*State Hospitals*).) One is cause in fact, also referred to as " 'but for' causation." (*Ibid.*) " ' "An act is a cause in fact if it is a necessary antecedent of an event." ' " (*Ibid.*) "The second aspect of proximate cause 'focuses on public policy considerations. Because the purported [factual] causes of an event may be traced back to the dawn of humanity, the law has imposed additional "limitations on liability other than simple causality." ' " (*Id.* at p. 353.) One of those limitations is " ' "the degree of connection between the conduct and the injury." ' " (*Ibid.*)

" 'Ordinarily, proximate cause is a question of fact which cannot be decided as a matter of law from the allegations of a complaint. . . . Nevertheless, where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law.' " (*State Hospitals, supra,* 61 Cal.4th at p. 353.) Thus, where the evidence shows the connection between the defendant's conduct and the plaintiff's alleged injury is "too remote," the court must remove the causation question from the jury and rule on the claim as a matter of law. (*Shih v. Starbucks Corp.* (2020) 53 Cal.App.5th 1063, 1071; *Modisette v. Apple Inc.* (2018) 30 Cal.App.5th 136, 154–155 [proximate causation must be decided as a "question of law" where the evidence shows the "gap" between the defendant's conduct and the plaintiff's injuries is "too great for the tort system to hold [the defendant] responsible"].)

27

Like other elements of a claim, a plaintiff must prove causation with " 'substantial' evidence, and evidence 'which leaves the determination of . . . essential facts in the realm of mere speculation and conjecture is insufficient.' " (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 484.) A "mere possibility of . . . causation is not enough; and when the matter remains one of pure speculation or conjecture, . . . it becomes the duty of the court to determine the issue in favor of the defendant as a matter of law." (*Ibid.*, citing Prosser & Keeton, Torts (5th ed. 1984) § 41, p. 269; see *Reese v. Smith* (1937) 9 Cal.2d 324, 328 [a judgment cannot be based on guesses or conjecture]; see also *Kumaraperu v. Feldsted* (2015) 237 Cal.App.4th 60, 68 [" 'As a matter of practical necessity, legal responsibility must be limited to those causes which are so close to the result, or of such significance as causes, that the law is justified in making the defendant pay.' "].)

In his proffer of evidence in advance of the Evidence Code section 402 hearing, Mireskandari proposed to prove defendants' conduct caused his alleged damages as follows:

> "One of the categories of actual damages
> Plaintiff claims to have suffered as a result of
> the breaches of fiduciary duty by [defendants]
> is that, but for the failure of [defendants] to
> advise Plaintiff that (1) he would be unable
> to obtain early discovery in the Daily Mail case
> if the case were filed in California, and (2) to
> advise him that he should file the action in
> another state without an anti-SLAPP statute in
> which there would be jurisdiction, specifically,
> Virginia, Plaintiff could have filed the action

in Virginia, obtained early discovery, and discovered certain facts that would have caused the proceeding against him before the Solicitors Disciplinary Tribunal to be ultimately stayed. Were that to have occurred, Plaintiff would not have been struck from the rolls of Solicitors. Plaintiff therefore would have been able to continue his law practice, from 2012 through retirement; would not have lost the valuable real properties in the UK which the SRA seized; would have been able to collect Dean & Dean receivables; and would not have been compelled to continue to pay attorneys in the UK to defend the SDT proceeding and related matters. Further, had the evidence that was discoverable been discovered at the early stage of the Daily Mail case, and presented to the SDT in May or June of 2012, that evidence would have avoided the assessment of $2.2 million in costs and fees against him. Such avoidance would have meant that he would not have been forced into bankruptcy and as a result, would not have lost assets including valuable contract rights."

To demonstrate he could marshal sufficient evidence of causation to present this damages claim to the jury, Mireskandari offered the testimony of nine witnesses, including four percipient witnesses who testified about purported misconduct in the SRA's investigation, and two expert witnesses, Judge Stanley P. Klein and Andrew Hopper QC, who testified

29

about Virginia litigation procedures and SDT disciplinary proceedings in the U.K.

Mireskandari's appellate briefs largely fail to discuss the witnesses' testimony and the trial court's related findings. The briefs make only an indirect reference to Judge Klein, referring to him as "a retired judge from Virginia who literally wrote the book on civil procedure there," without discussing the substance of Judge Klein's testimony. Similarly, Mireskandari's briefs refer to Hopper as a former lawyer for the SDT who "helped draft its rules," and obliquely imply Hopper offered testimony supporting Mireskandari's damages claim, but there is no discussion about the substance or particulars of Hopper's testimony. Nor are record citations provided to support whatever point Mireskandari intended to make about these experts' testimony. This approach to briefing is plainly insufficient to meet Mireskandari's affirmative burden as the appellant to demonstrate prejudicial error. (*Green v. City of Los Angeles* (1974) 40 Cal.App.3d 819, 835 ["An appellate court is not required to search the record to determine whether or not the record supports appellant['s] claim of error. It is the duty of counsel to refer the reviewing court to the portions of the record which support appellant['s] position."]; *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 ["If no citation 'is furnished on a particular point, the court may treat it as [forfeited].' "].)

Among other things that Mireskandari fails to address, the record shows Hopper previously consulted with Mireskandari about the SDT proceeding that resulted in the revocation of Mireskandari's solicitor's license. Hopper testified he had documented a number of "deficiencies" in the way Mireskandari conducted his defense in that proceeding, implicitly undermining

30

Mireskandari's claim that defendants' conduct was the cause in fact of the SDT's revocation decision. Shortly after Hopper's testimony, Mireskandari withdrew his claim that but for defendants' conduct, he would not have been struck from the solicitors rolls, and, as the trial court memorialized in its order, "waived his right to claim any and all damages resulting from the loss of his legal practice." On appeal, Mireskandari simply ignores this waiver, arguing he should have been allowed to prove to the jury that, but for defendants' conduct, he would have obtained "the discovery necessary to save his solicitor's license." Plainly the trial court did not err by accepting an express waiver, made, as the court emphasized and the transcript reflects, "on the record and in Mireskandari's presence." (See *Nevada County Office of Education v. Riles* (1983) 149 Cal.App.3d 767, 779 [if a judgment or order is in favor of a party's affirmative position he is not aggrieved and cannot object on appeal].)

After Mireskandari's waiver, he proceeded on the theory that, but for defendants' alleged breach, the SDT would have considered new evidence of the SRA's purported misconduct and, as a result, the SDT would have disallowed the assessment of costs and fees against Mireskandari in that proceeding.

With respect to that theory, the trial court found Judge Klein's testimony supported no more than speculation about Mireskandari's prospects of obtaining discovery through his hypothetical Virginia case in time to present it in the SDT proceeding. As the court explained, the testimony offered "no way for a reasonable jury to know whether the hypothetical case posed by Mireskandari would have been a middle of the bell curve case for Fairfax County," especially given Judge Klein's admission that Virginia judges exercise broad discretionary

31

powers over the discovery process.  Mireskandari makes no effort to explain why this finding constituted reversible error.

Even if the discovery could have been obtained in time, the trial court found Hopper's testimony supported no more than speculation about what the SDT would have done in response to the discovery.  As with the Virginia discovery process, Hopper confirmed the SDT rules vest the tribunal with "wide discretionary powers" regarding the costs to be paid by a party in a solicitor's disciplinary proceeding.  Indeed, Hopper acknowledged no case had ever been decided that presented facts similar to those that Mireskandari asked him to assume, and thus his opinion about how the tribunal would have exercised its discretion based on those assumed facts necessarily was, as he put it, "conjectural."  Mireskandari ignores this testimony and the trial court's related finding.  His discussion of Hopper's testimony is limited to repeating the assertion that, but for defendants' conduct, he could have presented evidence to the SDT before it concluded his proceeding, and claiming, without supporting record citations, that Hopper "testified to exactly that."

Beyond the two experts' testimony, the trial court found Mireskandari's evidence about the SRA's purported misconduct, and Hopper's assumptions incorporating that evidence, gave way to additional layers of speculation about how the SDT might exercise its discretionary authority to impose costs and fees. We need not discuss this evidence or the trial court's detailed findings about it.  Just as Mireskandari largely ignores the substance and particulars of the experts' testimony, he entirely fails to address this other evidence in his appellate briefs. This sweeping abdication of his duty to contend with evidence

32

and findings facially supporting the trial court's order constitutes a waiver and forfeits Mireskandari's claim of error. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*) [" 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' "]; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [Even on de novo review, "[i]ssues not raised in an appellant's brief are deemed waived or abandoned."].)

Simply put, Mireskandari does not present a record affirmatively demonstrating prejudicial error. Instead, he baldly asserts, in conclusory fashion, that his damages theory regarding the outcome of the hypothetical Virginia litigation and the SDT proceeding was a question of fact for the jury. But that assertion begs the question and entirely ignores the trial court's reasons for taking the issue from the jury. As the trial court correctly assessed, causation is a jury question only if there is sufficient evidence to allow a reasonable jury to reach a conclusion without resorting to speculation. (See *Knutson, supra,* 25 Cal.App.5th at p. 1094; *Williams, supra,* 33 Cal.App.4th at p. 133.) Here, as discussed, the trial court identified substantive deficiencies in the testimony of Mireskandari's two experts that rendered critical factual questions related to his damages theory "inherently unknowable" and, as a consequence, "speculative by a reasonable jury." Mireskandari does not address these deficiencies and, thus, utterly fails to meet his burden on appeal. (See *EnPalm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 775 [appellants forfeited claim of error where they did "not support that claim by way of argument, discussion, analysis, or citation to the record"].)

*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953 (*Piscitelli*) and *Blanks v. Seyfarth Shaw LLP* (2009) 171 Cal.App.4th 336 do not help Mireskandari.  In both cases, the reviewing courts recognized that, in a legal malpractice action, whether a court or jury decides the issue of causation "does not turn on the identity or expertise of the trier of fact, but whether the issues are predominately questions of fact or law." (*Piscitelli,* at p. 970; *Blanks,* at p. 358.)  But the problem with Mireskandari's theory is not that a jury lacks sufficient expertise to reasonably weigh the evidence and determine, more likely than not, what would have happened in a hypothetical Virginia case or how that would have affected the pending SDT proceeding.  The problem, as his own experts tacitly acknowledged and the trial court determined, is that his proffered evidence would leave a jury *to speculate* about how a Virginia court or the SDT might exercise its broad discretionary powers at each link in Mireskandari's assumed chain of causation.[5]  (See, e.g., *State Hospitals, supra,* 61 Cal.4th at p. 357

---

[5]    Relying on *Piscitelli*, Mireskandari argues the trial court merely needed to "adequately instruct the jury on the relevant law so that the jury [could] reasonably determine the questions of fact." (Cf. *Piscitelli, supra,* 87 Cal.App.4th at p. 971 [issues were not "so complex and numerous that a lay jury, properly instructed, could not comprehend them"].)  The record shows the trial court invited Mireskandari to submit proposed instructions for the jury's evaluation of the hypothetical Virginia case and the SDT proceeding.  Mireskandari neglected to submit any jury instructions regarding the Virginia case.  With respect to the SDT proceeding, the trial court found Mireskandari's proposed instructions would not provide adequate guidance to the jury because, among other things, they "fail[ed] to address the factors to be evaluated by the SDT, the weight to be given

34

[long series of "discretionary" determinations rendered theory of causation "conjectural" as a matter of law].)

Mireskandari has failed to present a record or argument affirmatively demonstrating the trial court erred. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609; *Denham, supra,* 2 Cal.3d at p. 564.)

**3.** ***The Trial Court Properly Enforced the Attorney-Client Privilege***

In an earlier writ proceeding involving these parties, we addressed whether "the attorney-client privilege applies to intrafirm communications between attorneys concerning disputes with a current client, when that client later sues the firm for malpractice." (*Edwards Wildman Palmer LLP v. Superior Court* (2014) 231 Cal.App.4th 1214, 1219 (*EWP*).) We concluded that "when an attorney representing a current client seeks legal advice from an in-house attorney concerning a dispute with the client, the attorney-client privilege may apply to their confidential communications," and we rejected the trial court's adoption of the so-called " 'fiduciary' " and " 'current client' "

---

to those factors, and/or any of the myriad of other norms or principles that might inevitably play a role in the exercise of the substantial discretion afforded to a specialized disciplinary panel like the SDT." Mireskandari does not mention the court's invitation or his proposed jury instructions in his appellate briefs, and he fails to explain why the court's finding constitutes reversible error. Again, Mireskandari has forfeited the issue. (See *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368 [" 'This court is not inclined to act as counsel for him or any appellant and furnish a legal argument as to how the trial court's rulings in this regard constituted an abuse of discretion' [citation], or a mistake of law."].)

35

exceptions to the attorney-client privilege, holding "courts are not at liberty to create implied exceptions to the attorney-client privilege" under California law.  (*Id.* at p. 1220.)  We thus directed the trial court to vacate its order compelling defendants to disclose communications between Shelton and EWP's general counsel, Swope, and remanded the matter to the trial court for consideration of factual questions that might affect application of the privilege.  (*Id.* at pp. 1236–1237; see also *id.* at pp. 1235–1236 ["When the evidence conflicts, whether the attorney-client privilege applies to a particular communication is a question of fact."].)

In rejecting the fiduciary and current client exceptions to the privilege, we acknowledged that "a law firm's representation of itself, or one of its partners, in regard to a dispute or a threatened claim by a current client, may raise thorny ethical issues." (*EWP, supra,* 231 Cal.App.4th at p. 1233.)  We reasoned, however, that violation of the Rules of Professional Conduct would properly subject the attorney to discipline, but "nothing in the Evidence Code suggests that a potential or actual conflict of interest . . . abrogates the attorney-client privilege." (*EWP,* at p. 1233; see also *id.* at p. 1231 ["The area of privilege is 'one of the few instances where the Evidence Code precludes the courts from elaborating upon the statutory scheme.' "].)  And we noted, as "a practical matter, it is not a foregone conclusion that an attorney's consultation with in-house counsel in regard to a client dispute will always be adverse to the client." (*Id.* at p. 1233.)  This is because the "attorney's and client's interests are likely to dovetail insofar as the attorney seeks to resolve the dispute to the client's satisfaction, or determine through consultation with counsel what his or her ethical and professional

36

responsibilities are in order to comply with them." (*Id.* at pp. 1233–1234.)

Regarding the factual issues left for the trial court's consideration, we explained "the privilege will attach only when a genuine attorney-client relationship exists" between in-house counsel and a law firm's attorneys or the firm itself. (*EWP, supra,* 231 Cal.App.4th at p. 1234.) To aid the trial court, we suggested the following factors articulated by the Massachusetts Supreme Court in *RFF Family Partnership, LP v. Burns & Levinson, LLP* (2013) 991 N.E.2d 1066 provided a "helpful template" for making this determination: "(1) the law firm must have designated, either formally or informally, an attorney or attorneys within the firm to represent the firm as in-house or ethics counsel, so that there is an attorney-client relationship between in-house counsel and the firm when the consultation occurs; (2) where a current outside client has threatened litigation against the law firm, the in-house counsel must not have performed any work on the particular client matter or a substantially related matter; (3) the time spent on the in-house communications may not have been billed to the client; and (4) the communications must have been made in confidence and kept confidential." (*EWP*, at pp. 1234–1235, citing *RFF,* at pp. 1068, 1080.) However, we made clear that these "factors are *not prerequisites* to establishment of an attorney-client relationship under California law," and emphasized they are only "*among the factors* that a trial court *may* analyze in determining whether an actual attorney-client relationship existed." (*EWP,* at p. 1235, italics added.)

After remand, the trial court appointed a discovery referee for the limited purpose of determining whether a genuine

attorney-client relationship existed between defendants and Swope. The referee consulted with the parties, set a hearing, and received testimony from Swope. Based on the evidence presented, the referee found defendants consulted Swope in his capacity as the firm's general counsel regarding Mireskandari's complaints about the firm's handling of the Daily Mail matter, and Swope provided legal advice to defendants in connection with email communications to Mireskandari, but Swope "did not review the legal strategies being suggested by the litigation team to [Mireskandari] in the Daily Mail matter nor did [he] suggest legal strategies for that underlying matter." Based on the referee's report, the trial court found a "genuine attorney-client relationship existed between Mr. Swope on the one hand and Ms. Shelton . . . and the firm in general on the other." Mireskandari does not dispute that the evidence presented to the referee was sufficient to sustain these findings.

Nevertheless, Mireskandari argues Shelton's subsequent trial testimony conclusively established there was not a genuine attorney-client relationship between defendants and Swope. He points to the following exchange, which he says proves Swope transgressed the second *RFF* factor by performing work on the *Daily Mail* case:

> Mireskandari's counsel: "[Swope's] role in this particular case was as the general counsel protecting the interests of Edwards Wildman Palmer?"
>
> Shelton: "Yes, and that also includes advancing the interests of our clients. I have

every confidence that [Swope] was working in the interest of Mr. Mireskandari."[6]

Contrary to Mireskandari's premise, there is nothing necessarily inconsistent between Shelton's testimony and the discovery referee's finding that Swope did not suggest legal strategies for the Daily Mail matter. As we explained in *EWP*, when an attorney consults in-house counsel about a dispute with a client, the "attorney's and client's interests are likely to dovetail insofar as the attorney seeks to resolve the dispute to *the client's satisfaction*." (*EWP, supra,* 231 Cal.App.4th at pp. 1233–1234, italics added.) Consistent with the notion that a client and his attorneys will likely have compatible interests in resolving their dispute, Shelton explained that while Swope represented the firm, the "firm was representing Mr. Mireskandari" and, as such, she understood Swope's work also to be in Mireskandari's interests. Because the issue implicates a factual

---

[6] Mireskandari also claims Shelton admitted she " 'collaborated' " with Swope on an email to Mireskandari " 'strongly recommend[ing]' that he 'explor[e] settlement with the Student Clearinghouse.' " Shelton did testify she collaborated with Swope on an email to Mireskandari that they "didn't charge him for," but there is no reference to exploring settlement with the NSC in the cited portion of the transcript or surrounding testimony. On the contrary, to the extent the transcript reveals anything about the text of the email, it shows the email addressed defendants' concern that " 'the attorney-client relationship [with Mireskandari] ha[d] broken down' "—a matter plainly within the ambit of Swope's attorney-client relationship with defendants. (See *EWP, supra,* 231 Cal.App.4th at p. 1237 [evidence Shelton sought legal advice from Swope about Mireskandari representation would establish existence of an attorney-client relationship].)

dispute about the existence of an attorney-client relationship, we must construe the evidence in the light most favorable to the trial court's finding, drawing all reasonable inferences to support it. (See *HLC Properties, Ltd. v. Superior Court* (2005) 35 Cal.4th 54, 60; *EWP*, at pp. 1235–1236.)

But even if we construed Shelton's testimony as evidence that Swope performed work on Mireskandari's matter, that still would not be sufficient to disturb the trial court's finding. Contrary to Mireskandari's other premise, we explained in *EWP* that the *RFF* factors are a "helpful template," but they "are *not prerequisites* to establishment of an attorney-client relationship under California law." (*EWP, supra,* 231 Cal.App.4th at p. 1235, italics added.) Other factors, such as Swope's independent role as EWP's general counsel, the confidentiality of his communications with defendants, and the fact that Mireskandari was not charged for Swope's work, all supported the court's finding that a genuine attorney-client relationship existed. Mireskandari cannot satisfy his burden as appellant by relying on a snip of testimony having dubious relevance to a single factor, while ignoring all the other evidence the discovery referee and trial court relied upon to find a genuine attorney-client relationship existed.

Apart from Shelton's testimony, Mireskandari contends the jury's special verdict finding that defendants " 'assembl[ed] a team to act against [Mireskandari]' " also conclusively establishes there was not a genuine attorney-client relationship with Swope. He maintains this finding "clearly indicates that the law firm labored under a conflict of interest" and "therefore could not properly invoke the attorney-client privilege" under our opinion in *EWP*. It is a curious argument, given that the crux of our holding rejecting the "fiduciary" and "current client"

40

exceptions in *EWP* was that "*nothing* in the Evidence Code suggests that a potential or actual conflict of interest . . . abrogates the attorney-client privilege." (*EWP, supra,* 231 Cal.App.4th at p. 1233, italics added.)

In any event, because this isolated special verdict finding reflects only the jury's interpretation of conflicting evidence on a single question unrelated to the existence of an attorney-client relationship, we fail to see why it compels us to disturb the trial court's express factual finding that such a relationship existed. " 'When the facts, or reasonable inferences from the facts, shown in support of or in opposition to the claim of privilege are in conflict, the determination of whether the evidence supports one conclusion or the other *is for the trial court*, and a reviewing court may not disturb such finding if there is any substantial evidence to support it.' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1208, italics added.) For his part, Mireskandari fails to acknowledge the applicable standard of review, or to present a convincing argument, supported by citations to *evidence* underlying the jury's finding, to demonstrate reversal is warranted. He has not satisfied his burden on appeal.

4.    ***The Trial Court Reasonably Denied Leave to Amend to Reinstate a Prayer for Punitive Damages***

A plaintiff may recover punitive damages in an action for breach of fiduciary duty against an attorney upon proof " 'the defendant's acts are reprehensible, fraudulent or in blatant violation of law or policy.' " (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1287; see Civ. Code, § 3294, subd. (a) [authorizing punitive damages in an action for breach of an obligation other than a contract upon proof "by clear and

41

convincing evidence that the defendant has been guilty of oppression, fraud, or malice"].)

In his second amended complaint, Mireskandari sought punitive damages based on allegations that defendants used his retainer payment in violation of the terms of their engagement agreement and that defendants misrepresented Shelton's qualifications. On November 20, 2014, the trial court granted defendants' motion to strike the prayer for punitive damages.[7] Mireskandari does not challenge the ruling.

On August 9, 2018, Mireskandari filed a motion for leave to file a third amended complaint reinstating his punitive damages request.[8] The trial court denied the motion, and Mireskandari challenges that ruling on appeal. He asserts leave to amend was warranted based on "additional facts" he discovered regarding "the debacle with Swope and privilege," which he maintains "amply demonstrated that Shelton had flagrantly misrepresented everything from her credentials to

---

[7] Mireskandari maintains the court "expressly left open the potential for Plaintiff to reinstate his prayer [for punitive damages] upon obtaining additional information through discovery," but the only record he cites for the assertion is his ex parte application for leave to file a third amended complaint. The order granting defendants' motion to strike is not at the page number listed in the index to Mireskandari's appendix, and the court is unable to locate the order in his more than 9,700-page appendix.

[8] Mireskandari does not appear to have included his motion in the appendix. He included an ex parte application for leave to file a third amended complaint, but even that record was not located in the appendix at the page number listed in his index.

Plaintiff's chances of prevailing." He does not provide record citations to support any of this.

The record cited by defendants shows the trial court denied leave to amend because Mireskandari had delayed almost four years in bringing his motion and he failed to identify "anything new and different" to justify reinstating punitive damages on the eve of trial. "The law is well settled that a long deferred presentation of [a] proposed amendment without a showing of excuse for the delay is itself a significant factor to uphold the trial court's denial of the amendment." (*Bedolla v. Logan & Frazer* (1975) 52 Cal.App.3d 118, 136, citing *Moss Estate Co. v. Adler* (1953) 41 Cal.2d 581, 586; *Roemer v. Retail Credit Co.* (1975) 44 Cal.App.3d 926, 939–940 ["The law is also clear that even if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial."]; see also *Eng v. Brown* (2018) 21 Cal.App.5th 675, 707; *Emerald Bay Community Assn. v. Golden Eagle Ins. Corp.* (2005) 130 Cal.App.4th 1078, 1097.) As Mireskandari fails to present a record affirmatively demonstrating error, we must presume the trial court exercised its discretion in accordance with this well settled law.[9] (See *Denham, supra,* 2 Cal.3d at p. 564.)

---

[9] In his reply brief, Mireskandari complains that defendants did not explain in their respondents' brief "what delay they are talking about or why it was unwarranted." He apparently forgets that, as respondents, defendants have no such burden on appeal. (See *Kriegler v. Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 226 [appellant bears the burden to affirmatively demonstrate error, regardless of whether respondent files a brief].) To the extent he suggests discovery disputes justified his delay, he again fails to provide citations to the record supporting the assertion. His statement that he "is not aware of any 'unwarranted delay' "

5. ***Mireskandari Fails to Demonstrate Prejudice from the Admission of Evidence Regarding His Financial Condition***

Mireskandari contends the trial court erred by allowing the admission of evidence regarding his ability to repay the attorney fees that others paid on his behalf. While he acknowledges the trial court "ultimately recognized," consistent with his position, that the collateral source rule precluded defendants from arguing he should not be allowed to collect damages for fees he did not personally pay, he nevertheless argues admission of the evidence was highly prejudicial because the jury awarded him no damages for EWP's breach of fiduciary duty.[10] We need not decide

---

is insufficient on its face, and refuted by the trial court's explanation of its reasons for denying leave to amend.

[10] While Mireskandari claims he made repeated objections to the introduction of evidence regarding his financial condition, he fails to provide proper record citations to support the assertion. Instead, in violation of rule 8.204, he appears to cite pages from daily transcripts that cannot be readily cross-referenced with the page numbers in the official reporter's transcripts. (See *Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 (*Del Real*) ["The appellate court is not required to search the record on its own seeking error."]; see also Evid. Code, § 353, subd. (a) [a verdict shall not be set aside due to the erroneous admission of evidence unless there "appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"].)

In response to our letter notifying Mireskandari and his appellate counsel we were considering sanctions for this and other rule violations (rule 8.276(d)), his counsel declared the improper citations were due to the court reporter transmitting

whether the trial court erred in admitting the evidence, as Mireskandari has failed to present a record demonstrating the purported error was prejudicial.

"A judgment will not be set aside based on the erroneous admission of evidence unless 'the reviewing court is convinced after an examination of the entire case, including the evidence, that it is reasonably probable a result more favorable to the appellant would have been reached absent the error.' " (*Hernandez v. County of Los Angeles* (2014) 226 Cal.App.4th 1599, 1616; Evid. Code, § 353, subd. (b).)  Prejudice "is never presumed but must be affirmatively demonstrated by the appellant." (*Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853–854 (*Brokopp*).)  To meet this burden, the appellant must show that, considering the entire record, it is reasonably probable the jury would have reached a result more favorable to the appellant absent the error.  (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

---

electronic copies of the reporter's transcripts that were separated by date "without proper cover pages or volume numbers."  While this may explain why counsel failed to include volume numbers in Mireskandari's transcript citations, it does not explain why many of the citations (including all the citations in this section of his opening brief) are to daily transcript page numbers, rather than to page numbers in the official reporter's transcripts. Defendants posit that Mireskandari simply "cut and pasted arguments from his post-trial motion without bothering to change the daily transcript citations in it"—a proposition borne out by comparing Mireskandari's post-trial motions to *identical* sections of his opening brief bearing the same daily transcript citations.

Mireskandari contends the "jury's verdict here strongly suggests that it was prejudicially influenced by the improperly admitted evidence, as [the jury] strangely found a breach but awarded no damages." When considered in the context of the entire record, the verdict is hardly strange at all.

Critically, Mireskandari's contention fails to acknowledge the jury categorically rejected his breach of fiduciary duty claim against Shelton and, with respect to EWP, it rejected four of the five theories Mireskandari advanced. The jury found liability against EWP on a single charge—that EWP knowingly acted against Mireskandari's interests in connection with the "assembling of a team of lawyers to act against him." As for all other theories—that defendants misrepresented Shelton's qualifications, failed to advise Mireskandari about the anti-SLAPP statute, failed to disclose malpractice, and abandoned him in the midst of the Daily Mail case—the jury found defendants did not breach their fiduciary duties to Mireskandari.

In view of these findings, Mireskandari cannot establish prejudice simply by pointing to the jury's decision to award no damages and speculating that it resulted from the admission of negative evidence about his financial condition. Rather, at a minimum he must show there was evidence to persuade the jury that he was entitled to damages for whatever injury he purportedly sustained due to EWP assembling a team of lawyers to act against him. In his briefs, Mireskandari fails even to identify an injury he suffered due to this conduct, let alone to cite *evidence* in the record connecting EWP's breach to his purported damages. (See *Moss v. Stubbs* (1931) 111 Cal.App. 359, 370 [to establish prejudice, the appellant

"must bring before the court sufficient evidence to show that [absent error] there might have been a finding in his favor"].)

Our review of his counsel's closing argument to the jury likewise fails to reveal what damages Mireskandari claimed to have suffered due to EWP assembling a team of lawyers to act against him. In explaining the theory, Mireskandari's counsel emphasized Swope and others at EWP were "ghostwriting" emails for Shelton after the attorney-client relationship began to deteriorate and this, counsel argued, proved defendants were "communicating with the client in ways that protect[ed] their own interest and not the client's" in breach of their fiduciary duty. But when it came time to discuss Mireskandari's damages, the claim that emails had been ghostwritten for Shelton fell away, and counsel's argument focused exclusively on the theory that Mireskandari would not have incurred successor counsel's attorney fees to clean up the "anti-SLAPP mess," if "it hadn't been for Ms. Shelton's advice and the law firm's failure to tell [Mireskandari] about it." As the jury rejected Mireskandari's claims that defendants failed to advise him about the anti-SLAPP statute and failed to disclose their alleged malpractice, it is not surprising, given counsel's closing argument, that the jury declined to award Mireskandari damages for the ghostwritten emails.

The apparent lack of damages evidence distinguishes this case from *Hrnjak v. Graymar, Inc.* (1971) 4 Cal.3d 725 (*Hrnjak*). In *Hrnjak*, our Supreme Court concluded the trial court's erroneous admission of evidence that the plaintiff received collateral source benefits, consisting of auto and disability insurance payments, prejudicially affected the jury's damages award. (*Id.* at pp. 726–727, 734.) The plaintiff had sued for

47

personal injuries sustained when the defendants' brakeless truck struck his car from behind.  The defendants conceded liability for the collision and the only litigated issues were the nature and extent of the plaintiff's injuries sustained as a proximate result of the collision and the damages to which he was entitled. As the *Hrnjak* court recounted:

> "Plaintiff's testimony and the medical evidence produced on his behalf indicated that the impact of the collision threw him forward and to the right and caused him to lose consciousness temporarily; he suffered a severe sprain to his back in the area of the lumbar spine and a cerebral concussion; because of these injuries, he experienced considerable pain in his lower back and radiating pain in his lower abdomen as well as dizziness and nausea; his symptoms prevented him from engaging in his occupation as a carpenter and cabinetmaker during the three and a half years between the accident and the trial and necessitated his finding a new vocation which would involve less driving, lifting, bending, and standing at heights than carpentry requires; at the time of the trial, plaintiff was in the process of acquiring training as a typewriter repairman from the State Department of Rehabilitation, at which occupation his earnings would be a maximum of $125 per week compared to earnings of about $200 per week as a carpenter; he would be required to wear a sacro-lumbar

back support for life, even in his new work; and his out-of-pocket medical expenses as a result of the accident amounted to more than $6,000." (*Id.* at p. 727.)

Notwithstanding this evidence, the jury awarded the plaintiff only $6,100 on his $100,000 claim. (*Hrnjak, supra,* 4 Cal.3d at p. 728.) Addressing the probable prejudice from the admission of collateral source evidence, our Supreme Court explained: "Although liability was not challenged, the issue of damages was sharply contested and the damage award was small; thus 'it is reasonably probable that a result more favorable to [plaintiff] would have been reached in the absence of the error.'" (*Id.* at p. 734.)

Unlike the plaintiff in *Hrnjak*, Mireskandari has cited no evidence of what damages supposedly flowed from the ghostwritten emails or anything else the jury may have considered in finding EWP assembled a team of lawyers to act against him. Thus, we have no way to determine whether the issue of damages on this theory was "sharply contested" and no evidence upon which to find it is reasonably probable Mireskandari would have achieved a more favorable result had evidence of his financial condition not been admitted. (Cf. *Hrnjak, supra,* 4 Cal.3d at p. 734.) Mireskandari has not affirmatively demonstrated prejudicial error. (See *Nazari v. Ayrapetyan* (2009) 171 Cal.App.4th 690, 694, fn. 1 ["While it is the duty of the appellate court in reviewing the denial of a new trial motion to review the entire record, on appeal it is manifestly 'the duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing

*exact page citations.' "*]; *Brokopp, supra,* 71 Cal.App.3d at pp. 853–854; *Del Real, supra,* 95 Cal.App.4th at p. 768.)

Mireskandari also fails to address other critical jury findings that practically disprove the contention that evidence of his financial condition may have underpinned the decision to award him no damages for EWP's breach of fiduciary duty. The court instructed the jury that even if it decided defendants were responsible for Mireskandari's injuries, he still was "not entitled to recover damages for harm that [defendants] proved Mr. Mireskandari could have avoided with reasonable efforts or expenditures." Consistent with this instruction, the special verdict form asked the jury to answer, upon a finding of liability for breach of fiduciary duty, "Could Mr. Mireskandari have reasonably avoided harm in any of the following categories without undue risk of hardship?" For each and every category of damages, the jury answered, "Yes." While Mireskandari characterizes the jury's rejection of his damages claims as "strange," he makes no effort to explain how the jury could have logically returned a verdict awarding him damages after finding he could have reasonably avoided *all* the harm he supposedly suffered. (See *Green v. Smith* (1968) 261 Cal.App.2d 392, 396 [Under the mitigation of damages doctrine, a "plaintiff cannot be compensated for damages which he could have avoided by reasonable effort or expenditures."].) In view of the jury's mitigation findings, it is not at all probable that Mireskandari would have achieved a more favorable result in the absence of the claimed error.

6. ***The Trial Court Reasonably Denied Mireskandari's Motion for a New Trial***

Mireskandari brought a motion for new trial on the following grounds: (1) defense counsel and the trial court improperly painted Mireskandari as a liar; (2) defense counsel improperly insinuated that Mireskandari and his wife were engaged in criminal conduct; (3) defense counsel's "persistent" misrepresentations and personal attacks cumulatively prejudiced Mireskandari; (4) the trial court erroneously admitted evidence of the SDT findings against Mireskandari; and (5) the trial court erroneously precluded Mireskandari from testifying about a hypothetical lawsuit in Virginia, but allowed defense counsel to cross-examine him about it. He makes the same arguments in his opening brief, copied almost (or, in some instances, entirely) verbatim from his new trial motion.[11] Because he made virtually no changes to arguments drafted before the trial court issued its ruling, he does not address the court's stated reasons for denying his motion or make any effort to explain why the court's decision constitutes an abuse of discretion.

A party is entitled to a new trial when an irregularity in the proceedings, or any order of the court or abuse of discretion, "materially affect[s] the substantial rights of such party" and prevents him from having a fair trial. (Code Civ. Proc., § 657(1).) " ' "The question whether, under all the circumstances, an irregularity has materially affected substantial rights and prevented a fair trial is addressed to the discretion of the

---

[11] In some instances, including his entire argument about the SDT findings, Mireskandari failed to update his record citations, leaving citations to daily transcripts in place of required citations to the official reporter's transcripts.

trial court, which—having heard and seen the witnesses, and having knowledge of circumstances which may not be reproduced in the record—is in better position than the appellate court to determine the effect." ' " (*Grant v. F. P. Lathrop Constr. Co.* (1978) 81 Cal.App.3d 790, 804 (*Grant*); *Merralls v. Southern Pacific Co.* (1920) 182 Cal. 19, 23; *Piercy v. Piercy* (1906) 149 Cal. 163, 166.)

An appellant has a duty to make a " 'cognizable argument' " on appeal as to why the trial court abused its discretion in denying his new trial motion. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277.) "Mere repetition of the arguments made in support of the motion in the trial court is *not sufficient.*" (*Ibid.*, italics added.) " ' "[A]n appealed judgment is presumed correct, and appellant bears the burden of overcoming the presumption of correctness." ' " (*Ibid.*; *Engleman v. Malchow* (1949) 91 Cal.App.2d 341, 344 ["Not only is the order denying a new trial supported by all presumptions of its correctness but the burden is upon appellant to show affirmatively that an order of denial is prejudicially erroneous."].)

The trial court denied Mireskandari's motion for new trial on the principal ground that he could not demonstrate the claimed errors materially affected his substantial rights, because the "verdict was based on lack of mitigation of damages" and none of the claimed errors "affect[ed] the mitigation of damages" finding. The court explained: "[T]hat was the Defense theory . . . that Mr. Mireskandari was a raging bull. He was single-minded in pursuing this . . . [a]nd despite the fact that he was repeatedly told by how many different lawyers in how many different contexts that this [claim] redefined the conventional notions of long shot, despite the fact that he repeatedly was losing, that

52

he was a raging bull for whatever reason. [¶] . . . [¶] . . . [I]t was apparent to me throughout this case that he was going to pursue this through years and years and years, despite the odds, despite the losses. . . . And the jury found that it wasn't reasonable to do that, that he could have cut his losses by, you know, going back to England . . . do[ing] something other than pursue all this litigation here in the U.S. [¶] . . . [So], even if it w[as] error . . . I don't see any way this could have changed the result."

The record supports the court's assessment. Mireskandari and the "quarterback" of his U.S. legal team, Bocchieri, formulated a plan for Mireskandari to file a lawsuit against the Daily Mail in California before approaching defendants to represent him. Defendants' original strategy to avoid First Amendment defenses had to be scrapped when the NSC informed Mireskandari, contrary to representations he made to defendants, that it did not have his law school records, thus confirming those records had not been "unlawful[ly] hack[ed]." Shelton testified she advised Mireskandari about the risks of an anti-SLAPP motion before defendants filed the first amended complaint on his behalf. Although she advised Mireskandari that filing an amended complaint posed new risks under the anti-SLAPP statute, Mireskandari instructed her to " 'move forward.' " After the SDT issued its decision against Mireskandari, his new counsel sent him a 43-page memorandum emphasizing the need for "a viable exit strategy," as it was "highly likely" that the English judgment barred "all or substantially all of the claims" against the Daily Mail. But Mireskandari charged forward in spite of this advice too, filing a second amended complaint with another new lawyer that drew another anti-SLAPP motion. He filed a third amended complaint

in the district court, then voluntarily dismissed his federal action, only to file a nearly identical state court action against the Daily Mail.  In the end, this court directed the trial court to dismiss Mireskandari's state court action under the anti-SLAPP statute, citing many of the same reasons highlighted in the 43-page memorandum Mireskandari received from his attorney more than two years earlier.

During deliberations, the jury asked about the mitigation of damages question on the special verdict form.  In response, the trial court reread the mitigation of damages instruction and stated that, under the avoidable consequences doctrine, "a plaintiff may not recover damages he could have easily avoided."  The court clarified that a "yes answer to a category of claimed damages means that Mr. Mireskandari could have easily avoided that category of claimed damages.  A no answer means that Mr. Mireskandari could not have easily avoided that category of claimed damages."  With that clarification, the jury returned a verdict unanimously finding Mireskandari could have reasonably avoided each and every category of claimed damages.

Mireskandari does not mention, let alone address, the evidence supporting the jury's mitigation of damages finding.  He fails to acknowledge that the jury's question accords with the trial court's assessment that the "verdict was based on lack of mitigation of damages."  Having failed to "set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable," he cannot fairly contest the trial court's finding that the claimed irregularities in the proceeding did not materially affect his substantial rights.  (*Doe v. Roman Catholic*

*Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218; *Grant, supra,* 81 Cal.App.3d at p. 804.)[12]

**7.** ***Mireskandari's Counsel Violated Rules Governing the Appellant's Appendix and Opening Brief, But Extraordinary Circumstances Generated by the Pandemic Make Sanctions Inappropriate***

Rule 8.276 authorizes a Court of Appeal, on motion of a party or its own motion, to impose sanctions on a party or an attorney for committing an "unreasonable violation" of the rules governing civil appeals. "Even if an appeal is neither frivolous nor filed solely for delay," the appellate court has independent authority under this rule to sanction a party or the party's attorney who " 'has been guilty of any . . . unreasonable infraction of the rules . . . as the circumstances of the case and the discouragement of like conduct in the future may require.' " (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 96, fn. omitted; *Bryan v. Bank of Am.* (2001) 86 Cal.App.4th 185, 194; *Alicia T. v. County of Los Angeles* (1990) 222 Cal.App.3d 869, 884–885 (*Alicia T.*).)

With their respondents' brief, defendants filed a motion for the assessment of monetary sanctions in the amount of

---

[12]     Defendants (and the trial court) presented compelling reasons to explain why none of the claimed irregularities constituted legal error. Mireskandari fails to address these points as well. In perhaps the most egregious example of this abdication, Mireskandari contends the trial court "vouched for defense counsel" and painted Mireskandari as "a liar," but he entirely fails to acknowledge that *his counsel agreed to the supposedly offending statement* when the trial court proposed it outside the jury's presence.

at least $10,000, payable to the clerk of this court, against Mireskandari and his appellate counsel, jointly and severally. Defendants identified a number of rule violations in Mireskandari's opening brief and appellant's appendix that, defendants' counsel declared, had "greatly increased the burden imposed on [defendants] in responding to Mireskandari's appeal."[13] Among other things, defendants cited the following infractions: (1) the appendix includes appendices from two earlier writ proceedings, spanning seven volumes and over

---

[13] Defendants also moved for sanctions on the ground that Mireskandari filed a frivolous appeal. In support of the contention, they requested we take judicial notice of Virginia court records showing Mireskandari filed a lawsuit against the Daily Mail in Virginia after the verdict in this case; discovery was stayed in that Virginia action; and the Virginia case was ultimately dismissed for lack of personal jurisdiction. Because this Virginia action was not part of the evidentiary record when the trial court ruled on defendants' motion for summary adjudication or when the court considered Mireskandari's damages claims under Evidence Code section 402, it is not relevant to any issue in this appeal. Moreover, as we explained, Mireskandari's professional negligence claim was based only in part on his proposed hypothetical Virginia lawsuit. Given the substantial attorney fees and sanctions he incurred litigating the Daily Mail's anti-SLAPP motion, the fact that this Virginia lawsuit was dismissed does not conclusively prove Mireskandari would not have achieved a more favorable outcome by declining to file his lawsuit in California. Because the Virginia court records are irrelevant, we decline to take judicial notice as requested. (See *Arabia v. BAC Home Loans Servicing, L.P.* (2012) 208 Cal.App.4th 462, 484, fn. 10.) We also do not find Mireskandari's appeal frivolous. (See *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.)

56

4,000 pages, that are not separately indexed with descriptions of their contents; (2) the documents in the appendix are arranged in reverse chronological order, making the appendix remarkably difficult to review; (3) several documents purportedly included in the appendix are not located at the page number listed in the index; (4) the index uses shorthand document descriptions, such as "CONSOL-OPP-NewTrial," "Admiss of SS ND Invoices Memo," "Filing Fees," "SM Notice to Appear," "MIL Renewal & MIL ex parte," that are not helpful for locating documents in the appendix; (5) the appendix includes several documents that were not part of the trial court record; (6) the appendix does not include several documents necessary for the consideration of issues raised in the appeal; (7) the opening brief does not include the volume number for record citations; and (8) the opening brief discusses documents or proceedings without supporting record citations.

With respect to the need for sanctions to deter future violations, defendants argued Mireskandari was likely to have other business before this court, citing the fact that, before this appeal, we had already filed four opinions in cases in which Mireskandari had been a party. Defendants also emphasized that Mireskandari's lead appellate counsel—a certified appellate specialist—had been involved in this case since 2019, having previously appeared before this court in connection with two earlier writ proceedings.

By letter we advised counsel for both sides that we were considering the imposition of sanctions based on some of the rule violations identified in defendants' motion. (See rule 8.276(c).) Our letter directed counsel to rules 8.124(d)(1), 8.144(b)(2)(C), and 8.144(b)(5)(A) (appellant's appendix must include a

57

chronological index listing each document in the appendix and the volume and page number where the document first appears); rule 8.124(b)(1)(B) (appellant must include any item that is necessary for proper consideration of the issues and any item that the appellant should reasonably assume the respondent will rely upon); and rule 8.204(a)(1)(C) (appellate briefs must support every reference to a matter in the record by a citation to the volume and page number of the record where the matter appears).[14]

In response, Mireskandari's appellate counsel acknowledged the appendix and opening brief violated the rules identified in our letter. While counsel expressed contrition for "any inconvenience or frustration the identified problems may have caused," she maintained the violations were "inadvertent and resulted from an unfortunate combination of receipt of a record already replete with errors and strained staffing resources due to the COVID-19 pandemic." Thus, Mireskandari and counsel opposed the motion for sanctions "on the basis that the violations, although regrettable, were not willful, did not prejudice [defendants], and were not unreasonable under the extenuating circumstances."

We will not recount counsel's detailed explanation of the "significant and unexpected obstacles" her office faced in completing the appendix and drafting the opening brief, including the unprecedent hardships the COVID-19 pandemic imposed on

---

[14] We also ordered Mireskandari's counsel to augment the record with all documents filed in connection with the motion for summary adjudication of the professional negligence claim. (Rule 8.155.) Counsel augmented the record as ordered.

her office and staff.[15]  We accept counsel's explanation and conclude the extraordinary circumstances her office encountered militate against assessing sanctions in this instance.  (Cf. *Alicia T., supra,* 222 Cal.App.3d at pp. 885–886 [sanctions are reserved for those instances when the court rules are "flagrantly"

[15]     One specific explanation, however, bears attention.  With respect to the reverse chronological arrangement of the index and appendix, counsel notes the applicable rule provides only that appendix documents must be " 'arranged chronologically' " (rule 8.144(b)(2)(C)), but she emphasizes it "does not specifically indicate in which direction the chronology should proceed."  This, in our view, is not a reasonable reading of the rule and, in any event, the decision to use a reverse chronology made little sense in this case.  Any practitioner who has read an appellate record should recognize there is a practical reason the rules mandate a chronological arrangement.  A chronological arrangement allows the reader to move from the end of one record to the beginning of a subsequently-filed record—e.g., from motion, to opposition, to reply, to ruling.  Counsel's use of a reverse chronological arrangement requires the reader to retrace back through a record, then back through the subsequently-filed record, to find the beginning of that subsequently-filed record.  That process is especially time consuming when the appendix spans over 9,700 pages and includes well over 100 documents, many of which are not separately indexed.  Moreover, because counsel included appendices from earlier writ petitions, which were arranged in the appropriate chronological order, there are parts of Mireskandari's appendix that are in chronological order and parts that are reversed.  And, because counsel did not separately index the documents embedded in the writ petitions, many of those documents have no chronological relationship (proper or reversed) to other documents in the appendix.  Suffice it to say, counsel's decision made reviewing the appendix a needlessly frustrating and time-consuming effort.

ignored and where counsel exhibits a "refusal to desist" from future rule violations].)

However, while we have declined to impose sanctions, we must emphasize that we did not come to the point of considering them in a haphazard or spontaneous manner. (See *Alicia T., supra,* 222 Cal.App.3d at p. 885.) Notwithstanding appellate counsel's contrition, her explanation implicitly admits that, faced with strained office resources and this court's notification that no further time extensions would be granted, she made the conscious decision to file an oversized opening brief and 14-volume appellant's appendix that she knew violated the applicable Rules of Court.[16] The effect of that decision, as counsel must have known, was to shift the burden onto opposing counsel and this court to navigate a materially deficient appendix without the aid of proper record citations.

That decision is especially vexing, given counsel's corresponding decision to include almost 30 pages of argument in Mireskandari's oversized brief that appear to have been simply copied and pasted from his post-trial motions. To be sure, forfeiture rules generally bar an appellant from challenging rulings on grounds that were not raised in the trial court, but that does not give an appellant license to throw every argument

---

[16] Ten months after Mireskandari filed this appeal, we granted his request for a two-month extension of time to file the opening brief and appellant's appendix, with a notification that no further extensions would be granted. Notwithstanding that notification, we granted Mireskandari an additional 14-day extension after notifying him of his default for failing to file a timely opening brief. All told, Mireskandari had almost 14 months from the date of the notice of appeal to prepare his opening brief and appendix.

from his post-trial motions into his opening brief without making the slightest effort to acknowledge our presumption of correctness or to explain why the trial court's rulings constitute reversible error.

"The public fisc is limited, and justices and support staff must carefully monitor and utilize their resources." (*Alicia T., supra,* 222 Cal.App.3d at p. 885.) If Mireskandari and his counsel did not have the time or resources to do anything more than copy and paste arguments from previously drafted motions, they should not have placed the burden on this court to craft an opinion rejecting those arguments.

## DISPOSITION

The order granting summary adjudication of the professional negligence claim is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.  The judgment is affirmed in all other respects. The parties shall bear their own costs.

## CERTIFIED FOR PARTIAL PUBLICATION

EGERTON, J.

We concur:

LAVIN, Acting P. J.

LIPNER, J.[*]

---

[*]    Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.